FILED ✓ ___ LODGED
___ RECEIVED ___ COPY

APR 1 7 2014

CLERK US DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

SEALED

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>vs.<br><br>  1.  John Keith Hoover,<br>      (1-38, 41-52)<br><br>  2.  John Brandon Hoover,<br>      (30-41, 50, 52)<br><br>  3.  Deborah Boice Hoover,<br>      (41-52)<br><br>                Defendants. | CR-14-00554-PHX-SRB (SPL)<br><br>**INDICTMENT**<br><br>VIO:<br><br>18 U.S.C. § 1343<br>(Wire Fraud)<br>Counts 1-15<br><br>18 U.S.C. § 1341<br>(Mail Fraud)<br>Counts 16-29<br><br>18 U.S.C. § 1349<br>(Conspiracy to Commit Bank Fraud)<br>Count 30<br><br>18 U.S.C. § 1344<br>(Bank Fraud)<br>Counts 31-38<br><br>31 U.S.C. § 5324(a)(3)<br>(Structuring Financial Transactions)<br>(Counts 39-40)<br><br>18 U.S.C. §§ 371<br>(Conspiracy to Commit Bankruptcy Fraud)<br>Count 41<br><br>18 U.S.C. § 152(1)<br>(Concealment of Assets)<br>Counts 42<br><br>18 U.S.C. § 152(2)<br>(False Testimony in a Bankruptcy Proceeding)<br>Counts 43-45 |

18 U.S.C. § 152(3)
(False Declarations in a Bankruptcy
Proceeding)
Counts 46-47

18 U.S.C. § 152(7)
(Fraudulent Transfer and Concealment of
Property in Contemplation of Bankruptcy)
Counts 48-51

18 U.S.C. § 152(4)
(False Proof of Claim)
Count 52

18 U.S.C. §  982(a)(1)
28 U.S.C. § 2461(c)
(Forfeiture Allegations)

THE GRAND JURY CHARGES:

At all times material to this indictment, within the District of Arizona and elsewhere:

## INTRODUCTION

## DEFENDANTS

1.     JOHN KEITH HOOVER ("J. HOOVER" or "JKH") is an attorney who resides in Mohave Valley, Arizona, and is in the business of real estate development and property management.  At various times between 1997 and the present, he created a network of entities for the purpose, among others, of soliciting individuals to invest in real estate developments.  The largest of these was known as El Rio Country Club.

2.     JOHN BRANDON HOOVER ("B. HOOVER" or "JBH") is a resident of California, the son of J. HOOVER, and a self-described real estate consultant.

3.     DEBORAH BOICE HOOVER ("D. HOOVER" or "DBH") is the wife of J. HOOVER and mother of B. HOOVER.

- 2 -

## **RELEVANT ENTITIES**

4.      Equity Capital Lenders, LLC ("ECL") purports to be a lending institution managed by B. HOOVER and D.B. Between 2008-2011, J. HOOVER and D. HOOVER ("the HOOVERS") transferred various assets to ECL to conceal control and ownership of their assets. From 2009-2010, ECL paid substantially all of the HOOVERS' business expenses.

5.      Hoover Quality Homes, Inc. is in the business of building homes in Fort Mohave, AZ and surrounding areas. It was wholly owned by J. HOOVER until being transferred to ECL between 2008-2010.

6.      El Rio Country Club, LLC is a business entity established by J. HOOVER to develop and sell residential lots in a golf course community in Mohave Valley, Arizona that covered approximately a square mile.

7.      Rio Oro, LLC, is a business entity designed to hold and develop a parcel of land located in California adjacent to the Colorado River. J. HOOVER diverted money received from investors and borrowed against the land and other business entities for his own benefit.

8.      Aztech Arizona, LLC was a Bullhead City, Arizona based cable and communications company. It was established by J. HOOVER to provide cable service for residents of El Rio Country Club and surrounding developments. B. HOOVER received a salary from 2008-2010 as the manager of Aztech.

9.      Hoover Land & Investments, LLC did business under the name of The Hoover companies. It provided management and accounting services to J. HOOVER's other various entities.

10.     Counsel Corp (a subchapter C Corporation) was a real estate brokerage wholly owned by J. HOOVER until it was transferred to ECL between 2008-2010.

11.     El Rio Capital, LLC was an entity J. HOOVER used to recruit investors and lend money to El Rio Country Club.

-3-

12.     Sevenstar Capital, LLC was established in 2005 for the purpose of raising money from investors for unsecured promissory notes. It lent investor money to other J. HOOVER companies. From 2005-2007, J. HOOVER frequently withdrew monies from Sevenstar Capital.

13.     Hoover Brothers Rentals, LLC was owned by J. HOOVER and B.H. and rented equipment to other J. HOOVER companies.

14.     Marina Professional Plaza, LLC was an entity J. HOOVER used to recruit investors for developing office or commercial buildings in Bullhead City, Arizona.

15.     El Rio Professional Plaza, LLC was organized to hold and manage commercial and office space constructed in Mohave Valley, Arizona adjacent to El Rio Country Club.

16.     SCI Terre D'Argent was a French Corporation established as a holding company for a Paris apartment purchased by the HOOVERS.

17.     Diamond BE was a business name used by B. HOOVER as owner/operator from at least 2006 to 2013, when a limited liability company of the same name was organized in Arizona, naming B. HOOVER and his sister as the two members of the company.

18.     Mariposa Phases 1-8 was a series of eight Limited Liability Companies established by J. HOOVER for the development of land in the Fort Mohave area.

19.     Mountain Star Capital was an LLC established by J. HOOVER ostensibly for the benefit of T.H.  J. HOOVER maintained control over how T.H.'s money was invested and disbursed.

20.     Oregon Pines, LLC was established by J. HOOVER to hold a parcel of land located in Oregon.

21.     El Rio Holdings, LLC was established as a holding company for assets of El Rio Country Club and related entities.  Investors who had lent money to El Rio Capital or Sevenstar Capital received an interest in this entity in lieu of repayment of their loans.

22.     Rancho San Juan Commercial, LLC was established to hold a parcel of land for development in the Needles, California area.

23.     Excellence Equities, LLC was organized in Arizona in May 2011.  Rancho San Juan Commercial transferred the parcel that it had held in the Needles, California area to this entity that same month.

## **FINANCIAL INSTITUTIONS**

24.     Wells Fargo Bank, NA, is headquartered in San Francisco, California, and is FDIC insured.

25.     Washington Mutual Bank, FA, was purchased by JP Morgan Chase in 2008 and was insured by the FDIC during the time period of the scheme.

26.     JP Morgan Chase Bank, NA, is headquartered in New York City, New York, and is FDIC insured.

27.     Mohave State Bank is headquartered in Lake Havasu City, Arizona, and is FDIC insured.

28.     First National Bank of Arizona was headquartered in Phoenix, Arizona, and FDIC insured at the time of the scheme.

29.     Whittier Municipal Employees Federal Credit Union was headquartered in Whittier, California, and was NCUA insured during the time period of the scheme.

30.     Los Angeles Federal Credit Union is based in Los Angeles, California, and is NCUA insured.

## **SELF DIRECTED IRA CUSTODIAN**

31.     Trust Administration Services Corporation (TASC) was originally a division of First Regional Bank of San Diego and offered Custodial Accounts which allowed individuals and their representatives to self-direct the investment of assets of an Individual Retirement Account.  Self-directed IRA accounts that were administered by TASC were subsequently administered by Sterling Trust, based in Waco, Texas, and Equity Trust Company, based in Elyria, Ohio.

**SUMMARY OF WIRE, MAIL, BANK, AND BANKRUPTCY FRAUD SCHEMES**

32.    Between 1997 and the present, the exact dates are unknown, J. HOOVER raised in excess of $20,000,000 from at least 460 investors for land development projects.

33.    J. HOOVER used some of the money for operational expenses for his various companies, primarily the El Rio Country Club and Golf Course located in Mohave Valley, Arizona.

34.    J. HOOVER  unlawfully used a large portion of money derived from investors for personal expenditures. Personal expenditures were, in many cases, disguised as business expenses. These expenses included, among others, to maintain a multi-million-dollar home in Newport Beach, California, a condominium in Newport Beach, California, an apartment in Paris, France, a 2006 Bentley Flying Spur automobile purchased for over $150,000, other luxury automobiles, art work, jewelry, home furnishings, an expensive wedding and salary for his son, schooling for his daughter in Paris, France, high end hotel rooms for family and friends, and other lavish expenditures.

35.    Investor money also was unlawfully used on junkets disguised as business related trips for J. HOOVER's family and employees that included, among others, Paris, France, Hawaii, China, South America, and Europe and other lavish trips.

36. When investor funds were not available, J. HOOVER, with the assistance of B. HOOVER, refinanced properties by misrepresenting material information to lenders that included employment, salary, assets, liabilities, and the source of down payments. By doing so, J. HOOVER and B. HOOVER committed bank fraud.

37.    Once J. HOOVER had exhausted the investor money, he filed for bankruptcy protection. With the complicity of his wife D. HOOVER and son B. HOOVER, he committed bankruptcy fraud by concealing from the Bankruptcy Court: home furnishings, real and personal property, recent transactions, and control of other assets.

## SCHEME TO DEFRAUD INVESTORS BY WIRE AND MAIL FRAUD

38.     Beginning in or about 1997 and continuing through the present, the exact dates are unknown to the Grand Jury, in the District of Arizona and elsewhere, J. HOOVER defrauded investors, and committed wire and mail fraud, by doing the following:

a.     J. HOOVER, in his capacity as a friend, associate, and attorney, obtained monies from California and Arizona based investors, several of whom were recently widowed. Some of these widows provided J. HOOVER with the bulk of their estates following the deaths of her husbands. The widows relied on J. HOOVER's long term friendship with their families and experience as an attorney to make sound investments.

b.     J. HOOVER also obtained monies from investors who had no experience in speculative real estate and relied upon J. HOOVER's experience and advice. In many cases, J. HOOVER encouraged investors to liquidate otherwise secure retirement funds to  invest in his own speculative real estate ventures.

c.     J. HOOVER misrepresented that the investor money was invested in secured loans.   J. HOOVER instead used that money for his own high risk speculative real estate ventures in Arizona and elsewhere. He also used the investor money on his own personal expenses.  When the investments lost considerable value, he failed to disclose the extent of the loss to investors.

d.     J. HOOVER sold, to a category of investors, ownership interests in specific real estate projects that included Mariposa, El Rio Country Club, Marina Professional Plaza, and Rio Oro, among others.  Despite representations that the monies would remain in the companies described above, J. HOOVER diverted monies from these investments to Sevenstar Capital.  From Sevenstar Capital, these monies flowed to other unrelated real estate projects or his own personal expenditures.

e.      J. HOOVER induced a number of investors to make what they believed to be low-risk, short-term loans to Sevenstar Capital, El Rio Capital, or J. HOOVER'S family trust with the promise of better than average returns.

f.      J. HOOVER ceased paying interest on these loans in November 2007, and induced or attempted to induce his investors to exchange their promissory notes for interests in a new entity called El Rio Holdings, LLC.

g      J. HOOVER made the following representations directly to investors (or directed sales representatives to make the following representations):

1. When the investors attempted to obtain their monies, they were falsely told that the money was dissipated or tied up in an investment and unavailable for redemption;

2. Investors were falsely told that J. HOOVER's business entities owned property that was "free and clear" without liens and purchased with cash;

3. Investors were provided with inflated valuations of the land held in the business entities in which they had invested;

4. Investors were misled concerning which specific properties secured the collateral for promissory notes;

5. Investors were falsely told that J. HOOVER would "match" the investor's investment in a particular project or that others, including his father-in-law, D.B., and/or son B. HOOVER, were also investing in a particular investment (which gave investors a false sense of security);

6. In some cases, investors were convinced to liquidate an Individual Retirement Account ("IRA") and place the funds in a self-directed IRA, with the false promise that the money would be returned by the time the investor would need the money;

7. Investors were falsely told that their money would be put toward a particular parcel and did not know that J. HOOVER was instead using the

money for other operational expenses of his companies or his own personal expenses;

8.    Investors were falsely told that the investments were secure because there was title insurance and the investor would receive insurance proceeds in the event of a default;

9.    Inexperienced investors were provided with inaccurate time estimates for the return of their funds and completion of projects, when J. HOOVER knew there was a low probability of a return in the time frame that was represented.    Further, he frequently diverted investor funds to projects on which he placed a higher priority, to the detriment of the investor.

h.    J. HOOVER had the investors liquidate mutual funds and securities, life insurance policies, and social security death benefits and directed the proceeds from these investments to LLCs controlled by J. HOOVER.

i.    J. HOOVER set up bank accounts that contained investor money so he was the only one who had signing authority.

j.    Without consent, J. HOOVER would convert loans that the investor had made to one of his entities into an equity interest.

k.    In some cases, J. HOOVER signed documents transferring monies on behalf of the investor without their knowledge.

l.    J. HOOVER had investors give him authority to make investment decisions on their behalf and invested monies in his best interest and not the investors'.

m.    The source of interest payments made to investors on promissory notes executed by J. HOOVER was derived from money from other investors.

n.    J. HOOVER defrauded investors of Rio Oro, LLC by obtaining loans secured by the real property intended to be developed, without the consent or knowledge of the investors, and then transferring the funds obtained through those

loans to other entities in which J. HOOVER had or has an interest. J. HOOVER defaulted on secured loan, thus causing the investors to lose any interest they had in the property.

o.     J. HOOVER made "call requests" to investors in his various entities, by demanding additional funds from those investors, purportedly for the payment of taxes and overhead expenses associated with operating those entities.

p.     From the time when Sevenstar Capital was formed in 2005, a substantial portion of the monies that investors paid into entities, such as the Mariposa phases and Rio Oro, were transferred from those entities into Sevenstar Capital, often within a week of receipt of the monies.

q.     From Sevenstar Capital, several million dollars were lent to El Rio Country Club and Aztech Arizona or to J. HOOVER, rather than to the entities where the investors had directed their money.

39.     J. HOOVER took the following actions to obtain money from investors or dissuade them from seeking repayment:

a.     In or around December 1997, J. HOOVER provided YM with a document stating that she had $684,936 in notes receivable. This document gave no detail as to which parties had issued the promissory notes. However, a similar statement from December 2001 showed that $432,400 of the notes were unsecured loans made to J. HOOVER'S company Counsel Corp. At different times during the scheme, YM had the majority of her monies invested with Sevenstar Capital and El Rio holdings, as well as Counsel Corp.

b.     In April 2001, J. HOOVER assisted TH with consolidating assets from various retirement accounts into one self-directed IRA with TASC. J. HOOVER instructed TASC to direct all communications related to the account through J. HOOVER'S office. Around this same time, J. HOOVER established Mountain Star Capital. J. HOOVER had signing authority on the Mountain Star Capital

bank account and TH did not. J. HOOVER had TH place the life insurance proceeds from the death of her husband with J. HOOVER, along with the proceeds from cashing out other life insurance policies for TH and her children.   At different times during the scheme, J. HOOVER invested TH's money and her children's money in Sevenstar Capital, Rio Oro, El Rio Country Club, and multiple phases of Mariposa.

c.      In or around April 2003, J. HOOVER signed documents on behalf of PC to authorize the purchase of an unsecured promissory note from El Rio Country Club in the amount of $182,000 with funds from PC's self-directed IRA with TASC.

d.      In or around February 2004, J. HOOVER had PC execute a document retroactively giving J. HOOVER authority to make all investment decisions for PC's IRA beginning in January 2003.  At different times during the scheme, J. HOOVER invested PC's money in Sevenstar Capital, El Rio Holdings, Rio Oro and Marina Professional Plaza.

e.      In or around October 2005, J. HOOVER advised JL in writing to invest $600,000 of her retirement funds in Mariposa Phase V, Marina Professional Plaza and Sevenstar Capital.  J. HOOVER also suggested that JL surrender an annuity, incurring a $7,000 penalty, in order to invest the money in J. HOOVER'S companies.

f.      Between November 2007 and March 2008, J. HOOVER sent letters to several investors, including DF, asking that they convert their promissory notes from El Rio Capital and Sevenstar Capital to an ownership interest in El Rio Holdings, thereby forgoing any expectation of payment of interest or repayment of principal.  DF lent money to the El Rio Country Club and invested in one of the Mariposa phases.

## COUNTS 1-15

### Wire Fraud

### (Violation of 18 U.S.C. §1343)

40.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### SCHEME AND ARTIFICE

41.    From or about at least 1997, the exact date being unknown to the Grand Jury, through on or about the present, in the District of Arizona and elsewhere, the defendant J. HOOVER, did knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions.

### PURPOSE OF THE SCHEME AND ARTIFICE

42.    It was the purpose of the scheme and artifice that J. HOOVER would solicit and obtain millions of dollars of investors' funds through false pretenses, representations, promises, and omissions all in order to obtain substantial economic benefits for himself and family members through the payment of fees, wages, bonuses, commissions, interest in real estate, and other monies. These funds were purportedly to be invested for the benefit of the investors but instead were diverted, misused, and misappropriated for other purposes. Once the investor money was exhausted, family members (including his wife D. HOOVER and son B. HOOVER) assisted J. HOOVER in actively concealing the remaining assets from the Bankruptcy Court.

### USE OF  WIRES

43.    On or about the dates specified as to each count below, the defendant J. HOOVER, for the purpose of executing the aforesaid scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as more particularly described below:

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION | |
|-------|--------------|-----------------------------------|--|
| 1 | 10/02/2009 | Interbank Wire | Rio Oro, LLC wired $1,814,687.72 (of the $4,000,000 that it borrowed on August 31, 2009) from Rio Oro's bank account at JP Morgan Chase to First American Title Insurance of Mohave, Inc. in Bullhead City, Arizona.  The wire paid off promissory note from Hoover Quality Homes, Inc., secured by a lien that had been on property including the land for Mariposa Phases V, VI, VII and VIII since April 2004. |
| 2 | 06/03/2011 | Fax | JKH, as managing member of Hoover Development Company, LLC, manager of El Rio Holdings, LLC sent a letter via facsimile to Sterling Trust providing valuation of PC's interest in El Rio Holdings LLC as $6,600. [10% of the amount invested, and the amount shown as the valuation on PC's IRA statements for the prior quarter.]  The letter also provided similar valuation of the interests in El Rio Holdings, LLC of 9 other IRA account holders. |
| 3 | 01/26/2012 | E-mail | JKH, as manager, sent an e-mail message to PC regarding a call for additional capital previously issued to Mariposa investors and |

| | | | proposed a buyout of those investors who do not make capital calls.   JKH asks that $240 be sent from each member to Management Professionals, LLC for accounting costs. |
|---|---|---|---|
| 4 | 02/06/2012 | E-mail | JKH, as manager, sent an e-mail message to PC regarding a call for capital previously issued to investors in the Estates at Rancho San Juan and proposed a  buyout of those investors who do not meet requirements of capital calls.   JKH asks that $178 be sent from   each   member   to   Management Professionals, LLC for accounting costs. |
| 5 | 02/06/2012 | E-mail | JKH, as manager, sent an e-mail message to PC regarding a call for capital previously issued to investors in Marina Professional Plaza, LLC and proposed buyout of those investors who do not meet requirements of capital calls.    JKH asks that $410 be sent from   each   member   to   Management Professionals, LLC for accounting costs. |
| 6 | 04/16/2012 | E-mail | JKH transmits a Schedule K-1 via e-mail to HH for Mariposa Phase IV, LLC for 2011. JKH indicates that other K-1's will require a $99 fee per K-1. |
| 7 | 02/18/2013 | E-mail | JKH transmits to HH via e-mail a letter notifying investors that K-1's are completed and that each Form K-1 will cost $99, which |

- 14 -

| | | | should be sent to Management Professionals. JKH promises a letter updating the company outlook will be coming shortly. |
|---|---|---|---|
| 8 | 02/18/2013 | E-mail | JKH exchanges e-mail messages with HH, stating that JKH will not send a Schedule K-1 to HH unless HH helps pay the accountants for the preparation of the tax returns. |
| 9 | 02/19/2013 | E-mail | JKH transmits a letter to HH via e-mail regarding a call for capital made to Mariposa Phase II, LLC investors two years earlier. JKH offers investors the choice of meeting their capital call or selling their interest to a new LLC for an estimated 4% of their initial investment. |
| 10 | 03/18/2013 | E-mail | JKH transmits a letter via e-mail to TH notifying investors that K-1's for Fairway I, LLC are completed and that each Form K-1 will cost $99, which should be sent to Management Professionals, LLC.    JKH promises a letter updating the company outlook will be coming shortly. |
| 11 | 03/20/2013 | E-mail | JKH transmits a letter via e-mail to TH notifying investors that K-1's for Rio Oro are completed and that each Form K-1 will cost $99, which should be sent to Management Professionals, LLC.   JKH promises a letter |

- 15 -

| | | | |
|---|---|---|---|
| | | | updating the company outlook will be coming shortly. |
| 12 | 03/21/2013 | E-mail | JKH transmitted a letter via e-mail notifying investors [entity not specified] that K-1's are completed and that each Form K-1 will cost $99, which should be sent to Management Professionals, LLC.  JKH promises a letter updating the company outlook will be coming shortly. |
| 13 | 05/08/2013 | E-mail | JKH transmits a letter to TH via e-mail regarding an unmet call for capital made to Rancho San Juan Hills, LLC investors two years earlier.   JKH offers investors the choice of meeting their capital call or selling their interest to a new LLC for an estimated 3% of their initial investment. |
| 14 | 03/03/2014 | E-mail | JKH transmits a message to HH via e-mail regarding all Mariposa phases, which states "We are in the process of concluding the sale of Phase 3 to the newly formed limited liability company."  JKH is actively searching for third parties willing to purchase the interests of selling members. |

| 15 | 03/03/2014 | E-mail | JKH transmitted a message to TH via e-mail regarding the Rancho San Juan, LLC restructuring proposal: "Thus far not enough existing members have been willing to purchase the membership interests of those choosing to sell." JKH stated that they only have until May 2014 to gather sufficient funds to pay delinquent taxes or they will be in jeopardy of losing the property. |

All in violation of 18 U.S.C. § 1343.

## COUNTS 16-29

### Mail Fraud

### (Violation of 18 U.S.C. § 1341)

44.     Paragraphs 1 through 39 of this indictment are re-alleged and incorporated by reference as though fully set forth herein.

45.     From in or about at least 1997, the exact date being unknown to the Grand Jury, through the present, in the District of Arizona and elsewhere, the defendant J. HOOVER, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions.

### PURPOSE OF THE SCHEME AND ARTIFICE

46.     It was the purpose of the scheme and artifice that J. HOOVER would solicit and obtain millions of dollars of investors' funds through false pretenses, representations, promises, and omissions all in order to obtain substantial economic benefits for himself and family members through the payment of fees, wages, bonuses, commissions, interest in real estate, and other monies. These funds were purportedly to be invested for the benefit of the investors but instead were diverted, misused, and misappropriated for other

- 17 -

purposes. Once the investor money was exhausted, family members (including his wife D. HOOVER and son B. HOOVER) assisted J. HOOVER in actively concealing the remaining assets from the Bankruptcy Court.

### USE OF THE MAILS

47.   On or about the dates specified as to each count below, defendant J. HOOVER, for the purpose of executing the aforesaid scheme and artifice, and attempting to do so, knowingly deposited and caused to be deposited the matters and things listed below, and caused the matters and things to be sent and delivered, by private and commercial interstate carrier and by the United States Postal Service:

| COUNT | APPROX. DATE | DESCRIPTION OF MAILING | |
|---|---|---|---|
| 16 | 08/20/2009 | Mail | JKH sent a letter to PC stating that the restructure of El Rio Country Club, LLC had been legally finalized.  "Our ability to survive the most severe recession since the 1930's is directly attributable to you, to all of our other investors who have agreed to participate in the El Rio restructure (now 84% of all outstanding investors) and to those who have not yet agreed to participate but have refrained from actions which would force El Rio into bankruptcy to the detriment of all."  The letter says that those who had become equity owners would receive quarterly reports commencing 3rd quarter 2009. |
| 17 | 01/27/2010 | Mail | JKH mailed a letter to PC, transmitting a Schedule K-1 for Mariposa Phase II, LLC, and stating: "The good news is that we own our property at Mariposa |

| | | | |
|---|---|---|---|
| | | | without debt.... Unfortunately the additional monies that were raised at the time of the original syndication of our company which were designed to carry the property's expenses for a two year period, have carried the expenses they were designed to carry but are now depleted." |
| 18 | 02/19/2010 | Mail | JKH mailed a letter to PC, transmitting a Schedule K-1 for Marina Professional Plaza, LLC for 2009. JKH reported that the company had traded part of its property in 2009 for property at Hwy 95 and Hulet Road.  JKH also stated: "In addition, our company seized the opportunity to acquire a member interest in San Juan Vistas, LLC an 80 acre commercial and industrial site on Highway 95 in Needles, California."  The letter also said that the monies that had been invested with the company were depleted, and that JKH would likely make a call for additional funds from each investor. |
| 19 | 03/19/2010 | Mail | JKH mailed a letter to PC, transmitting a Schedule K-1 for Aztech Arizona, LLC for 2009.   JKH stated that the company had made all the personnel cuts it could and still provide service, but also said that Aztech Arizona, LLC was launching a new program to attract customers with radio based telephone/internet service. |
| 20 | 03/19/2010 | Mail | JKH mailed a letter to PC, transmitting a Schedule K-1 for Rio Oro, LLC for 2009.  JKH reported that |

| | | | | another riverfront development had begun leasing/selling lots Memorial Day 2009 and also stated: "Accordingly I arranged sufficient financing to enable us to proceed to a final map stage on 135 acres of our site…. Our goal is to have our mapping process completed by Memorial Day 2010 so we can begin sales of the beachfront properties." |
|---|---|---|---|---|
| 21 | 01/13/2011 | Mail | | JKH mailed letter informing DF [and other investors] that he was filing for bankruptcy protection. JKH wrote: "My Counsel advises me that my personal bankruptcy filing should protect those projects in which I am managing member, general partner, member, partner or any combination thereof, from invasion or interruption by outside creditors or other partners, or member seeking recompense from me. This assurance was actually the impetus for the filing." JKH also wrote: "I apologize to you for any hardship that my personal financial failure may cause you but will endeavor to minimize the impact on you." |
| 22 | 03/31/2010 | Mail | | JKH mailed a letter to PC transmitting a Schedule K-1 and 2009 Profit and Loss statement for El Rio Holdings, LLC. JKH ascribed the tardiness of the tax return to uncertainty caused by investors who had not yet signed their subscription agreements to convert debt to equity and stated that those who |

| | | | |
|---|---|---|---|
| | | | converted their notes to equity now would receive a diminished amount of equity. JKH stated that the company was behind some on property taxes but had 6 years to redeem the property. JKH pointed out the operating agreement provides that no calls for capital can be made on our existing members. |
| 23 | 04/07/2011 | Mail | JKH mailed a letter to YM that proposed an amendment to operating agreement of Rio Oro, LLC allowing for discounted buyout of members who fail to meet capital calls. |
| 24 | 04/11/2011 | Mail | JKH mailed a letter to YM, transmitting a 2010 Schedule K-1, for El Rio Holdings, LLC. In the letter, JKH strongly recommended approval of an amendment to the operating agreement allowing calls for additional capital and strong incentives for members to contribute additional capital when called upon to do so. |
| 25 | 04/14/2011 | Mail | JKH mailed a letter to PC transmitting a proposed amendment to Operating Agreement to allow for capital calls. JHK stated that the alternative is to sell our property to the highest bidder, which, undoubtedly will result in a substantial loss of your investment. |
| 26 | 04/19/2011 | Mail | JKH sent a letter to Sterling Trust, the successor to Trust Administration Service Corporation. The letter contained notice that changes had been made in the books and records of Rio Oro, LLC. |

| | | | Accordingly the value of PC's interest in Rio Oro, LLC was reduced to $20,000, and the value of YM's interest in Rio Oro, LLC was $5,600 [10% of the respective amounts invested.] |
|---|---|---|---|
| 27 | 10/16/2013 | Mail | JKH mailed a letter to HH regarding the sale of an unspecified phase of Mariposa.  JKH stated that he was in the process of establishing an escrow for the purchase of the land for $2,935 per acre for a total sales price of $76,355 and that:  "The buyer is a new LLC of which you have been given the opportunity to become a member." |
| 28 | 03/02/2014 | Mail | JKH mailed a letter to TH regarding Rio Oro, LLC.  JKH called for additional capital of $31,000 from the investors, distributed pro-rata.  JKH proposed an amendment to operating agreement allowing anyone to purchase the interests of members defaulting on their capital calls for 10% of the defaulting member's interest.   The amendment provided that such a purchaser may pay with a 10 year promissory note, bearing 1% interest. |
| 29 | 03/15/2014 | Mail | JKH mailed a letter to TH [and an identical letter to PC] regarding El Rio Holdings, LLC.  JKH called for $783,000 in additional funds from investors.  JKH indicated that he would take non-payment of the additional funds as an election by the investor to sell their interest in the El Rio property. |

All in violation of 18 U.S.C. § 1341.

- 22 -

**COUNT 30**

**Conspiracy to Commit Bank Fraud**

**(Violation of 18 U.S.C. § 1349)**

48.     Paragraphs 1 through 39 of this indictment are re-alleged and incorporated by reference as though fully set forth herein.

49.     From a time unknown to the grand jury but at least as early as October 2004 through the present  in the District of Arizona, defendants J. HOOVER  and B. HOOVER and others known and unknown to the grand jury, conspired, confederated, and agreed with each other to commit Bank Fraud, in violation of 18 U.S.C. § 1344.

**The Purpose of the Conspiracy**

50.     The purpose of the conspiracy was as follows:

    a.     To obtain money and funds from  financial institutions to refinance existing properties so that banks would not foreclose on those properties; and

    b.     To use the money and funds for business and personal expenditures.

**Means and Method of the Conspiracy**

51.     It was part of the conspiracy that J. HOOVER and B. HOOVER would submit false loan applications that misrepresented income, assets, and liabilities so that they could refinance existing properties. In some cases, they recruited family members to use as straw buyers for the properties. The scheme was completed in the following manner:

    a.     J. HOOVER was a developer who used primarily lenders based in California or Arizona to obtain loans for development projects in Arizona and his personal residences in both California and Arizona.

    b.     J. HOOVER recruited family members, including his son B. HOOVER, D.B., S.G., and M.G., as borrowers for loans.

    c.     J. HOOVER misrepresented his income and that of his son B. HOOVER, inflated assets, omitted or misrepresented liabilities, and misrepresented the source of down payments so that he could refinance existing properties.

All in violation of Title 18 U.S.C. § 1349.

## COUNTS 31-38

### Bank Fraud

### (Violation of 18 U.S.C. § 1344)

52.     Paragraphs 1 through 39 of this indictment are re-alleged and incorporated by reference as though fully set forth herein.

53.     On or about the dates specified below, in the District of Arizona and elsewhere, each instance being a separate count of this indictment, defendants J. HOOVER and B. HOOVER knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution by means of materially false and fraudulent pretenses, representations, promises, and omissions.

### PURPOSE OF THE SCHEMES AND ARTIFICES

54.     It was a purpose of the schemes and artifices that the defendants J. HOOVER and B. HOOVER would borrow money from banks and credit unions using false or misleading claims on loan applications and personal financial statements.

55.     The counts of Bank Fraud are as follows:

| Count | Transaction | Date | Description of Misrepresentation |
|---|---|---|---|
| 31 | $5,000,000 construction loan to El Rio Country Club, LLC, as business based in Mohave Valley, Arizona, from Wells Fargo Bank, NA, for which JKH and DBH were Guarantors | 09/01/2005 | JKH and DBH signed an agreement stating that there had been no material adverse change in their financial condition since the most recent financial statement received by the Bank.  They also reaffirmed (among other documents) the loan agreement dated June 13, 2005, which required them as guarantors to provide financial statements that fairly represented their financial condition and had been prepared in |

| | | | accordance with generally accepted accounting principles [Under Section 10.1-Financial Information]. |
|---|---|---|---|
| 32 | Continuation of $5,000,000 construction loan to El Rio Country Club, LLC, as business based in Mohave Valley, Arizona, from Wells Fargo Bank, NA, for which JKH and DBH were Guarantors | 04/19/2006 | The bank received an updated statement of financial condition for JKH and DBH as of 12/31/2005. The statement reports total assets of $91,482,455, including balances of bank accounts that do not wholly belong to JKH or DBH.  The statement also falsely claims that the bulk of the assets in JKH's and DBH's IRA accounts were invested in First Trust Deeds. |
| 33 | Continuation of $5,000,000 construction loan to El Rio Country Club, LLC, as business based in Mohave Valley, Arizona, from Wells Fargo Bank, NA, for which JKH and DBH were Guarantors | 05/04/2007 | The bank received an updated statement of financial condition for JKH and DBH as of 09/30/2006. The statement reports total assets of $100,351,009 including balances of bank accounts that do not wholly belong to JKH or DBH.  The statement lists JKH's interest in each of the eight Mariposa Phases as $320,000, and falsely claims that the property for Mariposa Phases V through VIII are free and clear. |
| 34 | Continuation of $5,000,000 construction loan to El Rio Country Club, LLC, as business based in Mohave Valley, Arizona, from Wells Fargo Bank, NA, for which JKH and DBH were Guarantors | 06/30/2007 | The bank received an updated statement of financial condition for JKH and DBH as of 06/30/2007. The statement reports total assets of $101,613,788 and includes the same false and misleading statements regarding bank balances, asset values, nature of IRA assets, and the status of Mariposa properties as the statements as of 09/30/2004, 12/31/2005 and 9/30/2006.  JKH inflated the value of a parcel of land in Oregon at $3,087,000. |

| 35 | $220,000 Mortgage for JKH-DBH from Washington Mutual Bank, FA | 08/15/2007 | JKH and DBH signed a Form 1003, Uniform Residential Loan application that falsely stated that JKH received $50,000 per month in base employment income from his law offices in order to refinance a mortgage on a residence in Fort Mohave, Arizona and receive cash proceeds of about $22,833. |
|---|---|---|---|
| 36 | $156,000 mortgage for JBH from Washington Mutual Bank, FA | 11/01/2007 | JBH signed a Form 1003, Uniform Residential Loan Application that falsely represented that JBH made $20,000 per month from base employment income with Diamond BE, LLC and $5,000 per month in bonuses. |
| 37 | $232,000 mortgage for JBH from Los Angeles Federal Credit Union | 05/03/2010 | JBH provided a signed statement from the seller stating $68,000 had been paid by JBH to MG in cash outside of escrow and obtained financing with a loan application that included claim that an un-borrowed down payment of $60,000 had been made.  JBH also signed an amendment dated 04/02/2010 to the purchase contract stating the seller, MG, had made over $60,000 in improvements to the house acquired on 03/10/2010 and listing 15 improvements the seller had made. Based on these representations, the value and sales price of the home were determined to be $290,000. |
| 38 | $101,250 mortgage for SG and MG from Los Angeles Federal Credit Union | 11/14/2012 | SG and MG sign a loan application that includes a false claim that they have made an un-borrowed down payment of $40,000 towards the purchase of a property in Mohave Valley for $150,000 from Newport Land & Investments, LLC. |

All in violation of 18 U.S.C. § 1344.

**COUNTS 39-40**

**(Structuring Financial Transactions)**

**(31 U.S.C. § 5324(a)(3))**

**Introduction**

56.    Five days before J. HOOVER filed for bankruptcy, B. HOOVER opened a business bank account, known as Diamond BE, LLC, at JP Morgan Chase in Mohave Valley, Arizona.

57.    Two months after J. HOOVER filed for bankruptcy, B. HOOVER opened a business bank account, known as Newport Land and Investments, at JP Morgan Chase in Mohave Valley, Arizona.

58.    From May 3, 2011, through July 14, 2011, B. HOOVER structured $79,000 in cash withdrawals from the two aforementioned accounts.  JP Morgan Chase mailed B. HOOVER a Structuring Warning Letter on July 11, 2011 to the address B. HOOVER used to open the account, which is also the address of J. HOOVER and D. HOOVER.

59.    On or about the dates below, in the District of Arizona and elsewhere, B. HOOVER did knowingly and for purpose of evading the reporting requirements of 31 U.S.C. § 5313, and the regulations promulgated thereunder, structure and assist in structuring currency transactions with one or more domestic financial institutions, and did knowingly cause and attempt to cause a domestic financial institution to fail to file a CTR, as set forth in the following charts:

**COUNT 39**

**Diamond BE LLC – B. HOOVER - Chase Bank**

| Count | Account | Date | Amount | Description |
|-------|---------|------|--------|-------------|
| 39 | XXXXX5018 | 5/5/2011 | $   (5,000.00) | Cash Withdrawal |
|    | XXXXX5018 | 5/9/2011 | $   (5,000.00) | Cash Withdrawal |
|    | XXXXX5018 | 5/11/2011 | $   (5,000.00) | Cash Withdrawal |
|    |           | Total | $  (15,000.00) | |

- 27 -

## COUNT 40

### Newport Land & Investments – B. HOOVER - Chase Bank

| Count | Account | Date | Amount | Description |
|-------|---------|------|--------|-------------|
| 40 | xxxxx4953 | 5/3/2011 | $ (5,000.00) | Cash Withdrawal |
| | xxxxx4953 | 5/5/2011 | $ (5,000.00) | Cash Withdrawal |
| | xxxxx4953 | 5/11/2011 | $ (5,000.00) | Cash Withdrawal |
| | xxxxx4953 | 5/17/2011 | $ (5,000.00) | Cash Withdrawal |
| | xxxxx4953 | 5/20/2011 | $ (5,000.00) | Cash Withdrawal |
| | xxxxx4953 | 6/1/2011 | $ (6,000.00) | Cash Withdrawal |
| | xxxxx4953 | 6/2/2011 | $ (6,000.00) | Cash Withdrawal |
| | xxxxx4953 | 7/5/2011 | $ (6,000.00) | Cash Withdrawal |
| | xxxxx4953 | 7/7/2011 | $ (5,000.00) | Cash Withdrawal |
| | xxxxx4953 | 7/11/2011 | $ (5,000.00) | Cash Withdrawal |
| | xxxxx4953 | 7/12/2011 | $ (5,000.00) | Cash Withdrawal |
| | xxxxx4953 | 7/14/2011 | $ (6,000.00) | Cash Withdrawal |
| | | | Total  $ (64,000.00) | |

All in violation of 31 U.S.C. § 5324(a)(3).

### Introduction to Counts 41-54

60.    In 2007, J. HOOVER was heavily indebted to a number of banks, including M&I Marshall and Isley Bank and Wells Fargo Bank, N.A., based upon personal obligations and guarantees of debts in the name of J. HOOVER's entities.    At that time, J. HOOVER'S promissory notes and deeds of trust were in default and many investors in J. HOOVER's various projects were demanding returns of their capital.

61.    By 2009, several lawsuits and foreclosure proceedings were being filed by J. HOOVER's creditors, including several banks and individual investors, such as T. H. and J. F., against J. HOOVER, D. HOOVER, and their related entities.

- 28 -

62.     In late 2007, in the midst of J. HOOVER'S numerous real estate development projects and impending lawsuits, J. HOOVER caused the formation of a Delaware company called Equity Capital Lenders, LLC ("ECL").  Nominal ownership of ECL was originally held by D.B.  Later, on about January 2010, B. HOOVER acquired a nominal ownership interest in ECL as well.  J. HOOVER held out ECL as a "lending business" but J. HOOVER testified under oath that he did not know how ECL obtained any capital to fund loans and that he did not know of other borrowers from ECL besides himself and D. HOOVER.

63.     By 2009, when J. HOOVER was aware of the growing seriousness of his financial problems based upon the lawsuits, claims, and collection efforts being made by banks, investors, and other creditors, J. HOOVER was diverting funds he was receiving on behalf of his various corporate entities and funds he was receiving from various personal real estate rental activities, as well as commissions being earned in connection with real estate investment activity, into financial accounts held in the name of ECL.

64.     By the time that J. HOOVER and D. HOOVER filed for bankruptcy in early 2011, they had unfettered access to and unrestricted use of funds being held in financial accounts in the name of ECL and they regularly used funds from ECL accounts for the benefit of their family and themselves, paying substantially all of their regular personal living expenses with funds from ECL accounts.  J. HOOVER claimed that his and D. HOOVER's use of ECL funds were considered loans even though J. HOOVER did not keep track of the precise amounts or dates of such "loans".

## Overview of Chapter 7, Title 11, United States Code

65.     Chapter 7 of the Bankruptcy Code was enacted to assist the honest but unfortunate debtor in getting a "fresh start" from burdensome debts.  That fresh start is accomplished by the Bankruptcy Court's entry of an order of discharge, which forever releases the debtor from liability for certain debts and prohibits the creditors from ever taking any actions to collect on those debts.

66.     A Chapter 7 bankruptcy is also known as a "straight bankruptcy" or liquidation. The filing of a Chapter 7 petition automatically creates the bankruptcy "estate," which consists of all of the debtor's legal and equitable interests in property as of the date of the filing of the petition.

67.     A Chapter 7 case begins with the filing of a petition with the Bankruptcy Court. When a petition is filed, the debtor immediately receives an automatic stay, or injunction, that prohibits creditors from pursuing any further collection activity and that prevents creditors from initiating or continuing any lawsuits, wage garnishments, levies, or even telephone calls demanding payment.

68.     At the same time, upon the filing of the petition, the "estate" is created and all of the debtor's legal and equitable interests in property as of that date are vested in the estate. The debtor is thereafter prohibited from selling or otherwise disposing of the non-exempt estate assets unless the trustee abandons the property or sells the property back to the debtor. Ordinarily, the trustee will sell the assets and distribute the proceeds pro rata among the debtor's creditors.

69.     If a creditor has a valid lien on specified property of the debtor to secure a debt owed by the debtor to the creditor, the creditor is secured and is entitled to either recover the property or receive payment in the amount representing the fair market value of the property up to the amount of the debt owed. If the debt owed is more than the value of the property, the debt is under secured and the property subject to the lien is generally not available to satisfy the other creditors' debts. If the debt owed is less than the value of the secured property, the debtor will have equity in the property in the amount of the difference between the value of the property and the amount of the debt that is secured by the lien on the property. In that case, the value of the debtor's equity in the property is theoretically available to pay debtor's creditors in a Chapter 7 case.

70.     After the bankruptcy petition is filed, the debtor is required to file with the Bankruptcy Court a schedule of assets and liabilities. The debtor's schedule of assets and

liabilities is generally provided on forms provided by the Bankruptcy Court and is separated into lettered sections, such as Schedule A consisting of the debtor's interests in any real property. Other items of information required in the schedules include the following:

      a.    A list of all personal property assets of the debtor on Schedule B;

      b.    A list of all creditors with the amounts and nature of the debts owed by debtor on Schedules D, E, and F; and

      c.    A detailed list of the debtor's monthly income and living expenses on Schedules I and J.

71.    The debtor is also required to file a statement of financial affairs, which is referred to as the "SOFA", on which the debtor is required to divulge specifically requested information pertaining to the debtor's financial affairs and transactions before the bankruptcy filing.

72.    Between 21 and 40 days after the petition is filed, the trustee will hold a meeting of creditors at which the debtor is questioned under oath. The meeting is commonly referred to as the "341 meeting" after the Bankruptcy Code statute, section 341, dictating that the meeting take place. Creditors are allowed to appear at the 341 meeting and ask the debtor questions about his assets, liabilities, and financial affairs.

73.    After the 341 meeting, the trustee administers the case. If all of the debtor's assets are exempt or are subject to valid liens securing debts that exceed the value of the secured asset, the case is a "no asset" case and there will be no distribution to creditors. If there are nonexempt assets not subject to valid liens, then the trustee will marshal, or collect, and sell those assets for the benefit of creditors. Once the trustee has made all distributions to creditors, any debts that remain unpaid are typically discharged. Under some circumstances, such as fraud, however, the Bankruptcy Court may refuse to grant the debtor a discharge.

74.    In a Chapter 7 case, any property newly acquired by the debtor after the filing of the bankruptcy petition is not included in the estate, and, therefore, is not subject to being sold by the trustee to pay creditors. Assets in which the debtor had any legal or equitable interest as of the bankruptcy filing are included within the estate and, therefore, may not be sold or otherwise disposed of by the debtor once the case is commenced. In short, those assets no longer belong to the debtor and the debtor no longer has a right to sell those assets unless and until the trustee abandons the property or sells the property back to the debtor.

75.    The Bankruptcy Court can deny a debtor a discharge if it finds that, with the intent of hindering, delaying, or defrauding the creditors in bankruptcy, the debtor failed to disclose the debtor's interest in any property at the commencement of the case.

76.    It is the debtor's duty under the U.S. Bankruptcy Code to cooperate with the trustee in achieving the goal of liquidating the debtor's non-exempt assets in an efficient manner in order to maximize the return to debtor's creditors. A debtor's failure to cooperate with the trustee, for example, by hiding assets or providing false information to the trustee, may also serve as the basis for the Bankruptcy Court to deny the debtor a discharge in bankruptcy.

### The Defendants' Bankruptcy Fraud Scheme

77.    By December 2010, the HOOVERS were facing multiple lawsuits, foreclosures, creditors' claims, and collection activities.

78.    On about December 10, 2010, just about one month before their bankruptcy filing, the HOOVERS received a tax refund in the form of a check dated December 7, 2010 and made payable to the HOOVERS by the United States Treasury in the amount of $158,238.

79.    On December 14, 2010, exactly one month before the bankruptcy filing, the HOOVERS endorsed their entire tax refund check of $158,238 to S.W., a California

attorney who leased office space at the HOOVERS' commercial property located at
XXXXX S. Birch Street, Newport Beach, California.

80.    The endorsement of the HOOVERS' tax refund specified that S.W. was to retain
$100,000 as repayment of a purported loan from S.W. and that S.W. would be directed by
future correspondence as to how to disburse the remaining $58,238.

81.    J. HOOVER subsequently instructed S.W. to transfer the remaining balance of the
tax refund, totaling $58,238, to an escrow account held at Pioneer Title Agency in
Bullhead City, Arizona, Escrow No. XXXX1830 – 031 – DEY (the "Pioneer Escrow
Account").

82.    Thereafter, on January 5, 2011, 9 days before the bankruptcy filing, J. HOOVER
directed Pioneer Title Agency to wire transfer the net proceeds of the escrow account to a
JPMorgan Chase Bank account held in the name of ECL.

83.    In order to conceal that the source of the transfer of $58,238 from the Pioneer
Escrow Account came directly from a portion of the HOOVERS' personal tax refund, J.
HOOVER devised a scheme whereby it was made to appear as if the transfer represented
funds received as part of a larger loan by the "Soto Family Trust" to ECL.

84.    J. HOOVER effectuated the foregoing scheme by directing his son, B. HOOVER,
purportedly on behalf of ECL, to issue a Promissory Note Secured by Deed of Trust, in
the amount of $180,000 payable by ECL to the Soto Family Trust on December 28, 2010.

85.    The purported loan from the Soto Family Trust to ECL was set out in escrow and
transfer documents, which were made to appear as though the Soto Family Trust was
advancing a $180,000 cash loan to ECL, which was deposited into ECL's JP Morgan
Chase Bank account ending 7706.  Of that $180,000 amount, however, $58,238 consisted
of $58,238 from the HOOVERS' $158,238 tax refund, which was transferred first to
S.W., then to the Pioneer Escrow Account, and finally to the ECL JP Morgan Chase
Bank account.   Another $21,762 was funded by the borrower, ECL, itself coming from
Horizon Community Bank account ending 0540, over which J. HOOVER held signatory

1    authority.  Only $100,000 of the "loan" may have come from the Soto Family Trust.  D.

2    HOOVER held signatory authority over the ECL JP Morgan Chase Bank account, ending

3    7706, to which the purported loan funds were transferred.

4    86.    This entire transaction, by which at least $58,000 of personal tax refunds payable

5    to the HOOVERS was transferred to ECL, was completed just eight days before the

6    HOOVERS' bankruptcy filing.

7    87.    The funds in the JP Morgan Chase Bank account ending 7706 were routinely

8    transferred to a second account at JP Morgan Chase Bank, ending 7775, over which D.

9    HOOVER also held signatory authority.  D. HOOVER routinely used the funds in the JP

10   Morgan Chase Bank account ending 7775 to pay the HOOVERS' living expenses,

11   shopping at luxury stores including Neiman Marcus, Saks Fifth Avenue, Bergdorf

12   Goodman, staying at luxury hotels including the Four Seasons in Las Vegas and Florida,

13   the Fairmont Princess in Scottsdale, Arizona, and paying Newport Beach, Big Canyon

14   Country Club dues, among other expenses.

15   88.    In about December 2010, J. HOOVER and D. HOOVER received another federal

16   tax refund check dated December 7, 2010 and made payable to the HOOVERS by the

17   United States Treasury in the amount of $63,697.85.

18   89.    On December 23, 2010, J. HOOVER and D. HOOVER endorsed and deposited

19   their $63,697.85 federal tax refund check into Horizon Community Bank account number

20   ending 0540 held in the name of ECL.

21   90.    The Defendants effectuated the foregoing scheme to conceal their receipt and

22   transfer to ECL of personal federal tax refunds in excess of $220,000 on the eve of their

23   bankruptcy filing.

24                    **The HOOVERS' Bankruptcy Proceedings**

25   91.    On January 14, 2011, the HOOVERS filed a voluntary Chapter 7 bankruptcy

26   petition in the United States District Court for the District of Arizona under case number

27   0:11-01119-RJH.

28

- 34 -

92.     On February 4, 2011, the HOOVERS filed with the Bankruptcy Court Schedules of Assets and Liabilities and a Statement of Financial Affairs ("SOFA") in their bankruptcy case.   The HOOVERS each individually signed the Schedules and SOFA under penalty of perjury.

93.     In their Schedules and SOFA, the HOOVERS attested under oath to the following, among other things:

       a. That on the date of the bankruptcy filing, the HOOVERS held ownership interests in ten parcels of real property located in Arizona, California, and Texas;

       b. That on the date of the bankruptcy filing, seven of the ten parcels of real property identified on Schedule A were encumbered by liens in favor of ECL;

       c. That as a result of the value of the real properties on the date of the bankruptcy filing in combination with the value of the liens held by ECL, the HOOVERS had no equity in the value of those seven parcels of real property on which ECL held liens;

       d. That on the date of the bankruptcy filing, the only financial accounts in which they had any interest were a Charles Schwab Bank Trust account with a zero balance and a Whittier Municipal Employees Credit Union account with an $86.44 balance;

       e. That on the date of the bankruptcy filing, they owned household goods and furnishings, including audio, video, and computer equipment, with a total value of just $8,000;

       f. That on the date of the bankruptcy filing, they owned art objects, antiques, and other collectibles with a value of just $200;

       g. That on the date of the bankruptcy filing, they owned jewelry with a total value of just $1,000;

       h. That they owed secured debt to ECL;

i. That their two Mercedes vehicles were subject to liens securing debt owed to a company called Atlantic Auto Finance and that the amount of debt to Atlantic Auto Finance exceeded the value of the Mercedes vehicles;

j. That within ninety days before the bankruptcy filing, they had made no payments to any creditors in excess of $5,000;

k. That within one year before the bankruptcy filing, they had made no payments to any creditors who are insiders, which includes family members, companies owned or controlled by the HOOVERS, and companies owned by any of their family members;

l. That they had made no gifts in excess of $200 in value to anyone within one year before the bankruptcy filing;

m. That they had transferred no property, either absolutely or as security, within two years before the bankruptcy filing;

n. That they had transferred no property to a self-settled trust or similar device of which the HOOVERS were beneficiaries within ten years before the bankruptcy filing;

o. That there had been no setoffs made by any creditors against a debt owed by the HOOVERS within 90 days before the bankruptcy filing;

p. That they held or controlled no property owned by another person.

94.     J. HOOVER claimed on a financial statement dated June 30, 2007, that his and D. HOOVER's net worth as of that date, consisting of the value of total personal assets less total personal debts, was $93,058,101.00.  Just three and a half years later, J. HOOVER and D. HOOVER attested under oath on their bankruptcy pleadings that their net worth as of January 14, 2011, was zero.

95.     On or about May 12, 2011, B. HOOVER signed and filed a proof of claim purportedly on behalf of ECL, claiming that J. HOOVER and D. HOOVER owed ECL at

1  least $3.1 million secured by valid liens on the HOOVERS' property, including real

2  estate.

### J. HOOVER'S Ownership and Control of ECL

3

4  96.    As a result of J. HOOVER'S dominion and control over, access to, and use of

5  ECL funds, at the time of the bankruptcy filing, J. HOOVER had constructive ownership

6  and control of ECL and its financial accounts.

7  97.    The HOOVERS knowingly and fraudulently concealed from the trustee of their

8  estate, and from creditors, the United States Trustee, and the Bankruptcy Court, J.

9  HOOVER's beneficial and proprietary interest in ECL, by failing to disclose that

10  ownership and interest on their verified Schedules and SOFA in their bankruptcy case.

11  98.    In contemplation of bankruptcy and in order to deprive creditors of any means to

12  recover their debts, the HOOVERS transferred substantial sums of cash and property to

13  ECL. At the time of the bankruptcy, the HOOVERS had unfettered, unrestricted access

14  to and use of ECL assets, including funds in financial accounts in the name of ECL. The

15  only discernible reason for the transfer of funds and assets to ECL was to shield the

16  HOOVERS' personal assets from potential creditors and later from the scrutiny of the

17  bankruptcy court and interested parties.

18  99.    By the time the bankruptcy was filed, ECL was a sham entity whose separate

19  status as a legal entity should have been disregarded because ECL was merely the alter

20  ego or business conduit of J. HOOVER.  As such, the HOOVERS were required to

21  disclose not only their beneficial interest in ECL but the individual assets of ECL.

### Atlantic Auto Finance

22

23  100.   In June 2007, the HOOVERS owned a 2006 Bentley Flying Spur automobile.  At

24  that time, the Bentley was subject to a lien securing debt in the amount of about $136,000

25  owed by the HOOVERS to JP Morgan Chase Bank. At some point in 2008, the debt to

26  JP Morgan Chase Bank securing the Bentley was paid off and the HOOVERS held title

27  of the Bentley free and clear of any liens.

28

- 37 -

101.   In 2010, the HOOVERS sold the Bentley for $90,000.   Less than three months before the bankruptcy filing, J. HOOVER testified under oath that he and D. HOOVER had been living on and spending the $90,000 received from the sale of the Bentley.

102.   The HOOVERS never disclosed the sale of the Bentley on their SOFA, including specifically Item #10 of SOFA.

103.   During the course of the bankruptcy proceedings, the Chapter 7 trustee discovered that in June 2010, the Bentley had been sold to a third party for $90,000.  The trustee then asked the HOOVERS to explain the circumstances of that sale, why it had not been disclosed on their SOFA, and where the money had gone.

104.   In response to the Chapter 7 trustee's inquiries, B. HOOVER represented that at the time the Bentley was sold in June 2010, the Bentley was not owned by the HOOVERS individually, but was owned by the Hoover "family limited partnership," which was established in 2008 and of which B. HOOVER was a 50% partner, the HOOVERS were 25% partners, and B. HOOVER'S sister, E.H., was a 25% partner.

105.   B. HOOVER claimed that ownership of the Bentley had been transferred by the HOOVERS to the family limited partnership in January 2009.  Documents reveal that at the same time, in about January 2009,  the HOOVERS recorded liens against the Bentley in favor of an entity called Atlantic Auto Finance in exchange for a purported loan by Atlantic Auto Finance in the amount of $100,000.  Despite requests by the Chapter 7 trustee for documentation to substantiate that Atlantic Auto Finance had actually loaned money to J. HOOVER, D. HOOVER, or the HOOVERS' family limited partnership, no such documentation was ever provided.

106.   According to B. HOOVER, Atlantic Auto Finance was the name under which business was conducted by an entity called North Carolina Renewables LLC, which was a wholly-owned subsidiary of ECL.  North Carolina Renewables, LLC was registered in 2007 as a Delaware corporation whose principal offices were located in the HOOVERS' commercial property located at S.W. Birch Street in Newport Beach, California.  The

1   corporate registration documents filed on behalf of North Carolina Renewables, LLC

2   were signed by J. HOOVER.

3   107.   B. HOOVER further represented to the Chapter 7 trustee that when the family

4   limited partnership sold the Bentley in June 2010 for $90,000, that money was used to

5   pay off $90,000 of the purported loan from Atlantic Auto Finance (on behalf of North

6   Carolina Renewables, LLC) and that the remaining $10,000 of that debt was written off

7   as bad debt by Atlantic Auto Finance's parent company, ECL.

8   108.   Bank documents reveal that, on about June 17, 2010, the $90,000 received from

9   the sale of the Bentley was deposited directly into a JP Morgan Chase Bank account held

10  in B. HOOVER's name.

11  109.   The HOOVERS attested under oath on Schedule D of their bankruptcy Schedules

12  that their two Mercedes Benz vehicles which they owned free and clear of any liens as of

13  June 2007 were subject, at the time of the bankruptcy filing, to liens in favor of Atlantic

14  Auto Finance.  The liens placed on the Mercedes Benz vehicles in favor of Atlantic Auto

15  Finance were also put into place in January 2009, at a time when the HOOVERS were

16  facing multiple lawsuits, creditors' claims, and collection activities.

17  110.   The HOOVERS failed to disclose in their bankruptcy case that Atlantic Auto

18  Finance was the "doing business as" or "dba" name of an North Carolina Renewables,

19  LLC, in which J. HOOVER claimed to have an ownership interest.  The address provided

20  by the HOOVERS on Schedule D for Atlantic Auto Finance is located at an address in

21  Lynchburg, Virginia.   During the course of the HOOVERS bankruptcy, a subpoena

22  directed to Atlantic Auto Finance at the address provided by the HOOVERS was returned

23  with the notation that there was no business at that address.  The Chapter 7 trustee

24  subsequently investigated and discovered that the address listed for Atlantic Auto

25  Finance was a personal residence owned by an individual, M.W., who appeared to have

26  no connection with Atlantic Auto Finance.

27

28

- 39 -

**The Estate or "Garage" Sale**

111.  At the time of the bankruptcy filing, the HOOVERS declared that they owned household goods and furnishings worth approximately $8,000 and books, pictures, other art objects, antiques, and collections worth approximately $200.

112.  The entire value of the HOOVERS' household goods and furnishings was declared by the HOOVERS to be exempt from creditors' claims in bankruptcy under an Arizona statute which said, at the time, that each debtor was entitled to keep up to $4,000 worth of household goods and furnishings without having to turn those assets over to creditors.   The HOOVERS claimed a total combined exemption amount of $8,000 under the Arizona statute.

113.  Based on the values that the HOOVERS listed for all of their assets, both real estate and personal property, and based upon the exemptions claimed by the HOOVERS, the HOOVERS had a "no asset" estate insofar as all of their assets were either exempt from creditors or fully secured by liens in favor of, among others, ECL or Atlantic Auto Finance (as in the case of the two Mercedes vehicles).

114.  Consequently, based on what the HOOVERS disclosed in their bankruptcy documents, there would have been no non-exempt assets available to pay any creditors any portion of the HOOVERS' debts in bankruptcy.

115.  At the time of the bankruptcy filing, the HOOVERS in fact owned household goods and furnishings and other personal property assets in excess of the values stated in the bankruptcy schedules, including but not limited to, two crystal chandeliers, a Steinway grand piano, a custom pool table, and family heirlooms (the "undisclosed assets").

116.  The HOOVERs knowingly and fraudulently concealed the undisclosed assets from the Chapter 7 trustee, the U.S. Trustee, the creditors, and the Bankruptcy Court upon the filing and during the course of the bankruptcy case.

117.  In about November 2012, during the course of the HOOVERS' bankruptcy

proceedings, while the Chapter 7 trustee was undertaking efforts to collect and sell estate assets for the benefit of creditors,  the HOOVERS advertised that they would be holding an "estate sale," in the nature of a garage or yard sale, in Bullhead City, Arizona.

118.   In about November 2012, the HOOVERS conducted the estate sale by selling thousands of dollars' worth of undisclosed assets that had been intentionally and fraudulently concealed from their bankruptcy estate.

**COUNT 41**

**Conspiracy to Commit Bankruptcy Fraud**

**(Violation of 18 U.S.C. § 371)**

119.   Paragraphs 1-39 and 60-118 are re-alleged and incorporated as if fully set forth herein.

120.   From on or about late 2010, and continuing thereafter until the present, in the District of Arizona and elsewhere, defendants J. HOOVER, B. HOOVER, and D. HOOVER conspired, confederated, and agreed with each other to commit the following offenses against the United States:

    a. Concealment of Assets in violation of 18 U.S.C. § 152(1);

    b. False Testimony in a Bankruptcy Proceeding 18 U.S.C. § 152(2);

    c. False Declarations in a Bankruptcy Proceeding in violation of 18 U.S.C. § 152(3);

    d. Fraudulent Transfer and Concealment of Property in Contemplation of Bankruptcy in violation of 18 U.S.C. § 152(7); and

    e. False Proof of Claim in violation of 18 U.S.C. § 152(4).

121. Overt acts were committed in furtherance of the conspiracy, including but not limited to the overt acts listed in paragraphs 60-118.

All in violation of 18 U.S.C. § 371.

**COUNT 42**

**Concealment of Assets in Bankruptcy Proceeding**

**(Violation of 18 U.S.C. § 152(1))**

122.     Paragraphs 1-39 and 60-121 are re-alleged and re-incorporated as if fully set forth herein.

123.     On or about February 4, 2011 in the District of Arizona, the HOOVERS knowingly and fraudulently concealed from a custodian, trustee, marshal, and other officer of the court charged with the control and custody of property, and in connection with a case under title 11, from creditors and the United States Trustee, the following property belonging to the estate of a debtor, by failing to disclose in their Schedules and/or SOFA the following assets:

| Source/Date of Concealment | Assets Concealed |
|---|---|
| Schedules filed on February 4, 2011 [Doc #18] | One crystal chandelier originally kept at the HOOVERS' Newport Beach home |
| | A second crystal chandelier also originally kept at the HOOVERS' Newport Beach home |
| | A Steinway grand piano original kept at the HOOVERS' Newport Beach home |
| | A custom made pool table located at the HOOVERS' residence in Bullhead City, Arizona |
| | J. HOOVER's collection of framed one hundred dollar bills and one thousand dollar bills |
| | All of the undisclosed assets that were owned by the HOOVERS' at the time of the bankruptcy and that were later held out for sale at the HOOVERS' personal estate sale in about November 2012 |
| | Bank accounts in the name of ECL to which the HOOVERS had unfettered access and unrestricted use |
| | J. HOOVER's ownership interest in ECL |
| | Cash proceeds remaining from the more than $220,000 worth of tax refunds that the |

- 42 -

| | |
|---|---|
| | HOOVERS received within one month before the bankruptcy filing |
| | J. HOOVER'S ownership interest in an entity called Oregon Pines, LLC, which owned 2,000 of land in Klamath County, Oregon at the time of the bankruptcy filing |
| | J. HOOVER'S ownership interest in an entity called Rancho San Juan Commercial, LLC, which owned a parcel of land in the area of Needles, California |

All in violation of 18 U.S.C. § 152(1).

## COUNTS 43-45

### False Testimony in a Bankruptcy Proceeding

### (Violation of 18 U.S.C. § 152(2))

124.    Paragraphs 1-39 and 60-123 are re-alleged and re-incorporated as if fully set forth herein.

125.    On or about the dates set forth below, each instance being a separate count of the indictment, in the District of Arizona, the HOOVERS knowingly and fraudulently made a false material oath and account in and in relation to any case under title 11:

| Count | Source/Date of False Statement | False Statement |
|---|---|---|
| 43 | May 12, 2011 Examination under Oath of J. HOOVER in connection with 0:11-bk-01119-RJH | That J. HOOVER had no ownership interest in ECL |
| 44 | May 12, 2011 Examination under Oath of J. HOOVER in connection with 0:11-bk-01119-RJH | That J. HOOVER was a borrower/debtor of ECL |
| 45 | May 12, 2011 Examination under Oath of J. HOOVER in connection with 0:11-bk-01119-RJH | That all funds utilized by the HOOVERS coming from ECL accounts were legitimate loans from ECL to the HOOVERS |

All in violation of 18 U.S.C. § 152(2).

1

**COUNTS 46-47**

2

**False Declarations in a Bankruptcy Proceeding**

3

**(Violation of 18 U.S.C. § 152(3))**

4 126.    Paragraphs 1-39 and 60-125 are re-alleged and re-incorporated as if fully set forth

5 herein.

6 127.    On or about the dates set forth below, in the District of Arizona, the HOOVERS

7 knowingly and fraudulently made a false declaration, certificate, verification, and

8 statement under penalty of perjury, as permitted under Title 28, United States Code,

9 Section 1746, in and in relation to any case under title 11:

| Count | Source/Date of False Declaration | False Statements within the Declaration |
|-------|----------------------------------|------------------------------------------|
| 46 | February 4, 2011 Schedules filed in bankruptcy case 0:11-bk-01119-RJH [Doc #18] | That ECL held valid liens securing legitimate debt with respect to certain of the HOOVERS real estate holdings |
| | | That J. HOOVER had no ownership or interest in ECL |
| | | That the HOOVERS had no ownership of or interest in any financial accounts held in the name of ECL |
| | | That on the date of the bankruptcy filing the HOOVERS had zero cash on hand |
| | | That on the date of the bankruptcy filing, the HOOVERS held ownership of or interests in just two financial accounts with a total combined balance of $86.44 |
| | | That on the date of the bankruptcy filing, the HOOVERS owned household goods |

| | | | |
|---|---|---|---|
| | | | and furnishings worth just about $8,000 |
| | | | That on the date of the bankruptcy filing, the HOOVERS owned art and collectibles worth just about $200 |
| | | | That the HOOVERS owed genuine debts to ECL |
| | | | That the HOOVER'S two Mercedes vehicles were fully encumbered by valid liens held to secure genuine debt owed by the HOOVERS to Atlantic Auto Finance |
| | | | That J. HOOVER had no ownership in an entity called Oregon Pines, LLC |
| | 47 | February 4, 2011 Statement of Financial Affairs filed in bankruptcy case 0:11-bk-01119-RJH [Doc #19] | That the HOOVERs made no payments in excess of $5,000 to any creditors within 90 days before the bankruptcy filing |
| | | | That they had transferred no property, either absolutely or as security within two years before the bankruptcy filing |
| | | | That they had transferred no property to a self-settled trust or similar device of which the HOOVERS were beneficiaries within ten years before the bankruptcy filing |
| | | | That there had been no setoffs made by any creditors against a debt owed by the HOOVERS within 90 days before the bankruptcy filing |

All in violation of 18 U.S.C. § 152(3).

- 45 -

## COUNTS 48-51

**Fraudulent Transfer and Concealment of Property in Contemplation of Bankruptcy**

**(Violation of 18 U.S.C. § 152(7))**

128.    Paragraphs 1-39 and 60-127 are re-alleged and re-incorporated as if fully set forth herein.

129.    On or about the dates listed below, in the District of Arizona, the HOOVERS, in contemplation of a case under title 11 by and against the person and any other person and corporation, and with intent to defeat the provisions of title 11, knowingly and fraudulently transferred and concealed the following property:

| Count | Source/Date of Transfer or Concealment | Property Transferred/Concealed |
|-------|----------------------------------------|--------------------------------|
| 48 | December 2010 | Tax refund of $158,238 transferred to S.W. and then to ECL |
| 49 | December 2010 | Tax refund of $63,697.85 transferred to ECL |
| 50 | June 2010 | $90,000 proceeds from sale of Bentley transferred to B. HOOVER |
| 51 | December 2010 | Transferred numerous parcels of real property to ECL as part of claimed settlement of purported loan from ECL to J. HOOVER'S Individual Retirement Account |

All in violation of 18 U.S.C. § 152(7).

## COUNT 52

**False Proof of Claim**

**(Violation of 18 U.S.C. § 152(4))**

130.    Paragraphs 1-39 and 60-129 are re-alleged and re-incorporated as if fully set forth herein.

131.    On or about the date set forth below, in the District of Arizona, defendants J. HOOVER, B. HOOVER, and D. HOOVER knowingly and fraudulently presented a false claim for proof against the estate of a debtor, and used any such claim in any case under title 11, in a person capacity and as and through an agent, proxy, and attorney:.

- 46 -

| Count | Source/Date of False Claim | False Claim |
|---|---|---|
| 52 | May 12, 2011, Claim #118-1 filed in case 0:11-bk-01119-RJH | That the HOOVERS were legitimately indebted to ECL for debts exceeding $3 million and that such debt was secured by valid enforceable liens on property, including real property, owned by the HOOVERS |

All in violation of 18 U.S.C. § 152(4).

## **FORFEITURE ALLEGATIONS**

132.   Pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461 and as a result of committing one or more of the offenses charged in Counts 1-52 of this Indictment, Defendants J. HOOVER, B. HOOVER, and D. HOOVER shall forfeit to the United States, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to the following: $20,000,000 in U.S. currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property of Title 18, United States Code, Section § 981(a)(1)(c) and 28 U.S.C. § 2461.

133.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and 28 U.S.C. Section 2461, the Defendants shall forfeit substitute property, up to the value of the amount described above, if by any act or omission of the Defendants, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Sections 981 and 982(a)(1); 28 United States Code, Section 2461; and Rule 32.2(a), Federal Rules of Criminal Procedure.

1   A TRUE BILL

2

3   S/
    FOREPERSON OF THE GRAND JURY
4   Date:  April 17, 2014

5   JOHN S. LEONARDO
    United States Attorney
6   District of Arizona

7   S/
    KEVIN M. RAPP
8   Assistant U.S. Attorney
    JENNIFER A. GIAIMO
9   Special Assistant U.S. Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 48 -