**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR-14-554-1-PHX-SRB (SPL) |
| Plaintiff, | ) | **DETENTION ORDER** |
| vs. | ) | |
| John Keith Hoover, | ) | |
| Defendant. | ) | |

The Government seeks the detention of Defendant John Keith Hoover ("Hoover") on the ground that he is a serious flight risk[1] and no release condition or combination of conditions exist that would reasonably assure his appearance at future court proceedings if released. *See* the Government's Motion Re: Detention Pending Trial and Supplemental Motion Re: Detention Pending Trial, filed on April 22  and April 25, 2014, respectively. (Docs. 10, 20)  The matter has been under advisement since May 2, 2014, pending the Court's review of the detention hearing transcripts and documentary evidence submitted during the detention hearing.

After considering the Government's detention briefings and attached exhibits; all the

---

[1] Because none of the crimes charged in the indictment meets the statutory definition of "crime of violence" (18 U.S.C. §3156(a)(4)) within the context of the Bail Reform Act, the Government was precluded from seeking Defendant's detention on the ground that he is a danger to the community, economic or otherwise. *See United States v. Twine,* 344 F.3d. 987 (9th Cir. 2003); *United States v. Byrd,* 969 F.2d 106 (5th Cir. 1992).

evidence and proffers at the detention hearing held over two days; the arguments of both counsel; the controlling and persuasive authorities on the issues *sub judice* and all the factors set forth in 18 U.S.C. §3142(g), the Court finds that the Government has proven by a preponderance of the evidence that Hoover is a serious flight risk and no combination of conditions exist that would reasonably assure his appearance at future court proceedings if he were released from custody. Defendant John Keith Hoover shall remain detained pending resolution of this case.

**I. Background**

On April 17, 2014, a District of Arizona grand jury indicted John Keith Hoover ("Hoover"); his wife, Deborah Boice Hoover; and their son, John Brandon Hoover. (Doc. 3) They were arrested at their home on April 21, 2014, in Mohave Valley, Arizona, located near Bullhead City, Arizona and Needles, California, in western Arizona. (Docs. 28-30) The 48-page, 52-count indictment charges Hoover with the following crimes:

1. Wire Fraud (Counts 1-15), in violation of 18 U.S.C. § 1343, each count is a Class C felony;

2. Mail Fraud (Counts 16-29), in violation of 18 U.S.C. § 1341, each count is a Class C felony;

3. Conspiracy to Commit Bank Fraud (Count 30), in violation of 18 U.S.C. § 1349, a Class B felony;

4. Bank Fraud (Counts 31-38), in violation of 18 U.S.C. § 1344, each count is a Class B felony;

5. Conspiracy to Commit Bankruptcy Fraud (Count 41), in violation of 18 U.S.C. § 371, a Class D felony;

6. Concealment of Assets (Count 42), in violation of 18 U.S.C. § 152(1), a Class D felony;

7. False Testimony in a Bankruptcy Proceeding (Counts 43-45), in violation of 18 U.S.C. § 152(2), each count is a Class D felony;

8. False Declarations in a Bankruptcy Proceeding (Counts 46-47), in violation of 18 U.S.C. § 152(3), each count is a Class D felony;

9. Fraudulent Transfer and Concealment of Property in Contemplation of Bankruptcy (Counts 48-51), in violation of 18 U.S.C. § 152(7), each count is a Class D felony; and

10. False Proof of Claim (Count 52), in violation of 18 U.S.C. § 152(4), a Class D felony.

(*Id.*)

The indictment also seeks the forfeiture of "[a]ll property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to the following: $20,000,000 in U.S. currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property of Title 18, United States Code, Section § 981(a)(1)(c) and 28 U.S.C. § 2461." (*Id.*,¶ 132 at 47)

Generally, the indictment alleges Hoover "[o]rchestrat[ed] an investment fraud scheme for at least the last ten years resulting in an approximate $20 million loss to investors." (Doc. 10 at 2) "This scheme was followed by a Bankruptcy Fraud scheme where he enlisted the assistance of his wife and son to conceal assets." (*Id.*) The Government claims Hoover "[t]reated funds of his Newport Beach, California and Arizona investors and clients as his own, concealed various assets from the Bankruptcy Court, made false representations as to the value of assets under his control, and signed several documents that bear false statements under penalty of perjury." (*Id.*) The Government further contends Hoover "[c]ontinues to hold exclusive management control over investor funds, and continues to solicit and extort monies from clients and investors." (*Id.*)

## II. The Bail Reform Act of 1984

"The Bail Reform Act [the "Act"], 18 U.S.C. §§ 3141-3150, authorizes and sets forth the procedures for a judicial officer to order the release or detention of an arrested person, pending trial, sentence, and appeal." David N. Adair, Jr., Federal Judicial Center, *The Bail Reform Act of 1984*, p. vii (3rd Ed. 2006).  The Act mandates the release of a person pending trial unless the court "[f]inds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (quoting 18 U.S.C. § 3142(e)); *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). Conversely stated,  "[a] district court may not order pretrial release unless it determines that a 'condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Langenhorst*, 130 Fed. Appx. 892,

893 (9th Cir. 2005) (reversing district judge's order releasing the defendant from detention). A district court engages in a two-step inquiry before ordering a defendant either released or detained pending trial. *See United States v. Gentry*, 455 F.Supp.2d 1018, 1020 (D. Ariz. 2006) (citation omitted). First, a district court must make a finding as to whether the defendant presents a "serious risk that [the defendant] will flee," if released from custody. *Id.* (quoting 18 U.S.C. § 3142(f)(2)(A)). Second, if the defendant is likely to flee, the district court must determine whether some set of conditions would sufficiently vitiate that risk. *Id.* (citing, among others, 18 U.S.C. § 3142(g)). The burden of proof rests with the Government, which must establish risk of flight by a preponderance of the evidence, not by the higher standard of clear and convincing evidence for detention on the basis of danger. *See Motamedi*, 767 F.2d at 1406.

In determining whether release conditions exist that would reasonably assure a defendant's appearance, Section 3142(g) requires a district court to consider the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g). The weight to be accorded to each of these factors rests in the district court's discretion. *See Gentry*, 455 F.Supp.2d at 1020 (citing *United States v. Hollender*, 162 F.Supp.2d 261, 264 (S.D.N.Y. 2001)). If released, the combination of release conditions must be the "least restrictive" that will reasonably assure the defendant's appearance at future

court proceedings as required. *See* 18 U.S.C. § 3142(c)(B); *Motamedi*, 767 F.2d at 1405. Reminding district courts of the presumption of innocence and its corollary that the right to bail should be denied only for the strongest of reasons, the *Motamedi* court indicated that "[o]nly in rare circumstances should release be denied," and any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.*

**III. Risk of Flight**

Hoover is a 62-year old U.S. citizen, lawyer, and real estate developer who has no prior criminal history. (Sealed doc. 25 at 3, PTS Report)  He is an experienced international traveler who has traveled to Canada as recently as last year, France, Russia, Great Britain, New Zealand, China, the Caribbean, and other countries. (*Id.* at 2; Exhibit ("Exh.") 50 at detention hearing)  Hoover's U.S. passport, obtained by the FBI during a search of Hoover's home, reveals more detail regarding his most recent travel: China in October 27, 2011; France/England in October-November, 2011; France in March 2012; and Vancouver, Canada in 2013. (Doc. 20 at 2) (citations omitted). Credit card statements for Hoover and his wife also show charges for travel to the Philippines and South Korea in March and April 2010. (Doc. 10 at 7) (citations omitted). The Government argues that Hoover not only failed to disclose the breadth of his international travel to a Pretrial Services ("PTS") officer during an interview after his arrest, but also he was intentionally untruthful. (Sealed doc. 25 at 2) According to his PTS Report, Hoover claimed "he last traveled outside the United States in 2009, when he traveled to Korea . . . has traveled to Europe on multiple occasions and last traveled there in 2008, when he traveled for *business*." (Sealed doc. 25 at 2) (emphasis added)  Hoover did not explain to PTS the business reason he traveled to Europe. His statements after arrest when he last traveled outside the United States are significantly inconsistent with his own passport.

An asset the Government seeks to forfeit in this prosecution is a high-end, multi-story apartment located in Paris, France, in a prime location near the Eiffel Tower and the Seine River,[2] presently owned by a French corporation, SCI Terre D'Argent. According to the

---

[2] *See* Exh. 13 admitted in evidence at the detention hearing. The address is 9 Avenue de la Bourdonnais, Paris, France. *See* Google Maps, last viewed on May 13, 2014.

Government, SCI Terre D'Argent holds title to the apartment, but its corporate shares or other ownership instruments are titled in one or both of his adult children, Co-Defendant John Brandon Hoover and Evin Hoover, and directly controlled by Hoover. (Docs. 20 at 3; 10, Exh. 2 at 56[3])  The Government further claims Hoover failed to disclose the apartment's true worth to the Bankruptcy Court when he and his wife, Co-Defendant Deborah Boice Hoover, filed a Chapter 7 bankruptcy petition on January 14, 2011, BK-11-1119-MCW. (*Id.*, Exh. 26, detention hearing) According to the Government, the Paris apartment has been, and is, being rented out through a vacation rental-by-owner organization in France, but the rental income was not disclosed during Hoover's bankruptcy or subsequently and neither the recipient of the apartment's rental income nor the identity of who pays the apartment's debt on the loan to purchase the apartment are known to the Government at this time. (*Id.*) The Government further claims that Hoover, through his adult children or trusted third-parties, is actively trying to sell the Paris apartment at the present time. Hoover has as recently as April 16, 2014 received a cash offer of 2.54 million euros ($3.5 million according to Special Agent Tolhurst) "net to us" for the apartment. (Docs. 20-2, Exh B, at 2-5) The legal and *de facto* owners of this Paris apartment are disputed by the parties. Additional evidence presented at the detention hearing also indicated Hoover was looking for a vacation residence in the south of France as recently as April 12, 2014. (Exh. 29, detention hearing)

The Government believes Hoover has "[a]ccess to significant amounts of money, both in [U.S. and foreign bank] accounts and cash on hand, which could provide him the means to flee to avoid prosecution." (Doc. 10 at 7; Exhs. 21, 25, copies of French bank account

---

According to Special Agent Tolhurst's testimony at the detention hearing, circumstantial evidence supports the Government's claim that Hoover controls this French legal entity as SCI Terre D'Argent is also the titled owner of lots 12-19 at El Rio Country Club, one of Hoover's real estate developments.

[3] The June 12, 2013 email from Hoover to James B. Hoeppner, an accountant, states, in relevant part: "[O]ur [Paris, France] apartment has been listed for sale for 3,150,000 euros and we owe about 1,200,000.00 euros against it which leaves us with some fairly significant equity when the apartment sells. . . ."

statements[4]) (citing, among others, 18 U.S.C. § 3142(g)(3)(A)). The Government informs the Court that Hoover "prepared a financial statement dated March 31, 2008 and submitted it to a credit union in the process of applying for a loan. . . [and] claimed on that application to have over $91 million in net worth." (*Id.*; *see also* Declaration of FBI Special Agent Robinson, Exh. B, ¶¶ 7-8, 10-11, 19-23)  Special Agent Robinson's declaration avers that as of March 31, 2008, Hoover claimed to own "twenty-two . . . properties in Arizona and California, along with a series of parcels of land in Oregon and two rentals in Houston, Texas." (Exh. B, ¶ 7 at 18)  According to the Government, while several of the assets listed on this financial statement were overvalued by Hoover, the disposition of many of the listed assets between the date of the financial statement (March 2008) and the time he filed his bankruptcy petition (February 2011) or at the present time is unknown to the Government. (*Id.* at 7-8)  For example, the Government claims Hoover and his wife held at least one sale in late 2012, after the bankruptcy filing, where Hoover sold for cash several items that Hoover had stored since taking them from model homes and office buildings controlled by him prior to foreclosure on those properties by banks. (*Id.* at 8) The amount of cash received from the sale of these items and the disposition of that cash are unknown to the FBI. (*Id.*)

This background information is relevant to the Government's argument that Hoover has the financial means and travel expertise to effectuate a "strong incentive to flee." (Doc. 10 at 3) The Government has projected a Guideline sentence calculation that, if he were convicted at trial of all charged crimes, Hoover will likely spend the rest of his life in a federal prison. If convicted of Counts 1-38 and considering anticipated enhancements for Specific Offense Characteristic (Loss: $7,000,000- $20,000,000), Specific Offense Characteristic (Sophisticated Scheme), Abuse of Trust/Use of Specialized skill, Involved 250 or more victims,[5] Hoover's sentence would calculate to a Criminal History Category I and a Guideline Offense Level of 38, resulting in a Guideline prison range of 235-293 months.

---

[4] According to one bank statement, which is in Deborah Hoover's name, found during the FBI's search of Hoover's office, there is approximately $10,000 in the account.

[5] Special Agent Desirae K. Tolhurst testified at the detention hearing that the FBI has counted 460 victims of Hoover's crimes.

(*Id.*, Exh. A, at 15) If also convicted of Counts 41-52, the Government claims these "[c]ounts would run consecutive to any sentence imposed on counts 1-38." (*Id.*) The Government correctly notes that the Ninth Circuit permits a district court to consider possible punishment as an incentive for a defendant to flee in assessing a defendant's risk of flight. *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("[T]he defendants are charged with multiple counts, and it is reasonable, from their perspective, to look at the potential maximum sentences they face if they were found guilty on each count and sentenced consecutively on each count. . . Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990) (noting the defendant's foreign contacts as a key factor in its decision to affirm pretrial detention).

Here, the Government points to the Paris, France apartment that Hoover purportedly controls, his extensive foreign travel and recent interest in traveling to southern France for a vacation rental, his access to financial resources the whereabouts of which are largely unknown to the Government at this time due to Hoover's concealment of his assets from the Bankruptcy Court, his numerous misrepresentations on financial statements and loan applications, and his intentional failure to file tax returns as the basis to conclude that Hoover is a serious flight risk and should be detained pending trial.

The Court finds that Hoover is neither credible nor trustworthy. Numerous examples were provided to the Court during the course of, or related to, the detention hearing to support these findings, such as, the Government's detention briefings and the unrefuted testimony of FBI Special Agent Desirae K. Tolhurst. A few are listed herein as representative of many facts or statements purportedly made by Hoover to support the Court's findings. For example, in an October 2010 debtor-creditor examination held a few months before his bankruptcy filing in early 2011, Hoover testified under oath that he lost the Paris apartment to a bank that financed its purchase. Hoover also represented in his verified bankruptcy schedules, filed in February 2011, that his interest in the French corporation, SCI Terre

D'Argent, which holds title of the Paris apartment, was worth nothing ("0.00").[6] (*See* Exh. 26, detention hearing) Despite these representations made under oath, the Court has already noted Hoover's contrary statements in a June 12, 2013 e-mail message to his accountant *after* Hoover's bankruptcy schedules were filed. *See* footnote 2 herein. Also, pursuant to the FBI's recent search of Hoover's home, law enforcement discovered written lists of Hoover's personal goals for 2011, 2013, and 2014. (*See* Exh. 46, nos. 4, 6, 24, 28, 31, and 45, detention hearing) Some of his 50 personal goals for 2014 are "Sell France apartment," "Buy house in So. Of France Deb likes," "Get all LLC's transferred to kids," "Sell Oregon property," "Travel to France to say goodbye to Apt.," and "Visit at least 3 new countries[.]" (*Id.*) Similarly, Special Agent Robinson avers in his declaration that:

> J. HOOVER has made varied and contradicting statements regarding the control and value of an apartment in Paris, France. In September 2005, J. HOOVER and D. HOOVER purchased an apartment in Paris for 1,390,000 Euros through a French Corporation owned by them, B. HOOVER and one other family member. D. HOOVER later told an acquaintance that they had spent over $1 million on renovations in the apartment. J. HOOVER told several people that he had bought the apartment for his daughter to live in while attending college in Paris.

(*See* Declaration of Special Agent Robinson, Exh. B, ¶ 24, at 26)

Another example of Hoover's practice of deception is how he and his wife have managed to purchase or lease an expensive BMW automobile. In December 2013, a new 5-Series BMW was purportedly purchased or leased by Hoover's 88-year-old father-in-law, who is unable to drive, with a little over $20,000 of the purchase price coming from an auto loan. (Doc. 20 at 5) According to a former neighbor, Robert Billaud, who lives in the El Rio Country Club development, testified at the detention hearing that he's seen Deborah Hoover drive this vehicle. In the same month of its acquisition, Hoover wrote a check for over $11,000 to his father-in-law with a memo suggesting that the check was to pay off a portion of the car loan. Another check for $12,500 was written by Hoover's son to Hoover's father-in-law in December 2013.

---

[6] Special Agent Tolhurst opined that a U.S. bankruptcy court does not have the lawful authority to seize a Paris apartment without going through, and the significant involvement of, the French government.

In his February 2011 bankruptcy filing, Hoover itemized the assets he and his wife owned, declaring under oath they had no cash on hand, their furs and jewelry had a value of $1,000, and "Misc. Books/Pics" were worth only $200. (Exh. 26, Schedule B - Personal Property)  During the April 22, 2014 FBI search of Hoover's residence, however, the FBI recovered approximately 125 pieces of jewelry that have an estimated value of several hundred thousand dollars, including the following:

- Statements for one of two French bank accounts and showing ongoing debits and credits as recent as March 31, 2014;

- A ladies 18-carat white gold Vacheron & Constantin watch with receipt, dated July 7, 2004, valuing it at $20,300;

- A men's platinum Philippe Patek watch with receipt dated, September 24, 2003, valuing it at $22,150;

- An Emil Vernon "Girl with a Bird's Nest" painting with a receipt, dated December 9, 2004, reflecting a value of $62,182.40;

- Eight fur coats with values the Government estimates ranging from between $5,000 to $11,500 each;

- $4,000 in United States Currency; and

- A 7 to 9 carat lady's diamond ring.

(*See* Doc. 20 at 4) (exhibit numbers omitted); detention testimony of Special Agent Tolhurst)

Taken together, the Government's proffers and evidence presented are sufficiently convincing and beyond a preponderance of the evidence for the Court to find that Hoover presents a serious flight risk if released.

**IV. Factors to Consider If Conditions Exist to Reasonably Assure Appearance**

**1. Nature and Circumstances of the Crimes Charged**

The Government argues that the charges herein involve sophisticated criminal conduct based upon lies and deception, resulting in millions of dollars in losses to approximately 460 victims, carrying significant prison sentences. It argues that the documents provided to the Court show that Hoover is an experienced traveler to foreign countries, has often placed others' assets and money in bank accounts in the names of his immediate family members and legal entities he controls, and used his experience and abilities as an attorney to defraud many victims, including former clients and several widows, of their life's savings.

For example, Special Agent Tolhurst testified that she recently interviewed an elderly victim, T.H., who informed her of the following. Hoover was a long-time friend and attorney for T.H. and her husband, who was a successful certified public accountant. Hoover prepared legal documents, such as wills, and provided some estate planning for them. T.H.'s husband unexpectedly developed cancer and died shortly thereafter. Hoover held a post-funeral reception for T.H. at Hoover's home and thereafter took T.H. "under his wing." Hoover convinced T.H. to allow Hoover to invest her husband's life insurance proceeds and other estate money, approximately 3.1 million dollars, in Hoover's "speculative real estate" and other investments. Hoover placed T.H.'s money into an account for Mountain Star Capital, a legal entity that Hoover created, to hold only T.H.'s money. Thereafter, Hoover instructed his Executive Assistant, Carol Graham,[7] to write checks from the Mountain Star Capital account, containing T.H's money, to Hoover's trust, his father-in-law, and Hoover's IRA. Copies of some of the checks received in evidence were:

> 1. check no. 1015, made payable to John K. Hoover Trust, in the amount of $149,000.00, dated February 19, 2002, with a Memo entry that states: "Principal Payback/Drexel City[?]";
>
> 2. check no. 1016, made payable to D.L. Boice, Hoover's father-in-law, in the amount of $50,000.00, dated February 25, 2002, with no Memo entry indicating why it was written to him;
>
> 3. check no. 1048, made payable to John K. Hoover Trust, in the amount of $12,232.40, dated September 1, 2003, with a Memo entry that states: "Loan El Rio CC - Waag Loan Assumption";
>
> 4. check no. 1017, made payable to Counsel Corp,[8] in the amount of $55,000.00, dated February 21, 2002, with a Memo entry that states: "Loan to 10 October/Payoff Cooke";[9]

---

[7] *See* Exh. 1, detention hearing, of the Hoover Companies' corporate structure.

[8] According to Special Agent Tolhurst, Counsel Corp is one of the many legal entities created and controlled by Hoover. *See, e.g.,* Exh. 2, www.thehoovercompanies.com (last viewed on May 13, 2014).

[9] Special Agent Tolhurst testified that Patricia Cooke is another widowed victim-investor of Hoover's. Special Agent Tolhurst stated that Ms. Cooke knew Co-Defendant Deborah Boice Hoover's father, D. L. Boice, trusted the Hoover family, and lost $1.8

5. check no. 1053, made payable to Counsel Corp, in the amount of $3,000.00, dated January 2, 2004, with a Memo entry that states: "Loan to Counsel Corp"; and

6. check no. 1054, made payable to "First Regional Bank FBO John K Hoover IRA," in the amount of $80,000.00, dated Feb. 13, 2004, with a Memo entry that states: "Granada Land Equities Partial Payoff".

(Exhs. 10-12, detention hearing)

Special Agent Tolhurst testified at the detention hearing that during the time T.H.'s money was invested with Hoover, she received letters, statements, and K1s, indicating how her investments with Hoover were doing. T.H. told Special Agent Tolhurst that when she approached Hoover to obtain some of her money to pay for her children's Ivy League education and some of T.H.'s medical expenses, Hoover told her the money was gone and she should send her kids to state schools. T.H. ended up moving in with one of her children due to Hoover dissipating her life's savings.

Consistent with this pattern and practice of using his clients' and investors' money as his own, the Government informs the Court that the FB1 investigation has discovered that Hoover has "[c]onverted funds borrowed against his investors' business assets to purchas[e] the house where the Defendant has lived for the past several months." (Doc. 10 at 6) Additionally, the Government alleges that Hoover has "[a]lso converted dues from the homeowners association managed by Defendant to use as a down payment for another piece of property purchased from his son by his son's wife's mother." (*Id.*)

The Court notes, as 18 U.S.C. § 3142(g)(1) requires, that none of the federal crimes for which Hoover was indicted constitute a "crime of violence," as defined by 18 U.S.C. § 3156, nor do they involve allegations of controlled substance distribution or firearm possession or usage. Thus, no rebuttable presumption of detention arises pursuant to 18 U.S.C. § 3142(e)(3) that Hoover is a serious flight risk or a danger to the community. None of the pending charges carry a mandatory statutory minimum prison sentence if Hoover were

---

million she invested with Hoover. So far in this investigation, Special Agent Tolhurst has uncovered four victims who are widowed. Y.M. lost $1.2 million as best the FBI can determine. Another is J.L. In each instance, Hoover took control of their money and life insurance proceeds, invested their money, and lost it.

convicted, or involve federal crimes of terrorism, minor victims, explosive, or destructive devices. Hoover argued at the detention hearing that Exhibits 201-205 rebut the Government's argument that Hoover's potential lengthy prison sentence would serve as motivation to flee. He claimed that the Sentencing Commission's statistics for the District of Arizona reveal that white-collar defendants frequently do not receive lengthy prison sentences.

Viewing the Government's evidence of Hoover's ability to flee if released, as the district court similarly did in *Hollender*, 162 F.Supp.2d at 266, in light of the very serious nature and circumstances of the crimes charged, and the substantial risk of flight that they portend, this Court concludes that the first § 3142(g) factor strongly favors the Government's detention request and Hoover's continued detention.

### 2. Weight of the Evidence against Defendant

Of the four detention factors a district court must consider, the Ninth Circuit has instructed that the weight of the evidence is the least important of the factors. *Motamedi*, 767 F.2d at 1407; *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir.1972).

The evidence against Hoover is overwhelming and considerable. The documentary evidence of Hoover's allege fraud and deceit, presented on the issue of detention alone early in the criminal process of this indictment, is very substantial. In addition to the FBI special agents and other law enforcement agents involved in this investigation; the substantial documentary evidence available to date and will be developed as this case proceeds to trial; and the widow-victims identified during the detention hearing, the Government has its pick of approximately 460 victims likely willing to testify against Hoover to explain his misrepresentations, his lack of their authority to spend their money for his own personal use, and the further details of his crimes.

While the Court recognizes that the law presumes Hoover is innocent of all charges, the Court finds that the second § 3142(g) factor strongly favors the Government because convictions are likely, and no set of release conditions would reasonably assure Hoover's appearance at trial or other court proceedings if he were released from custody.

**3. History and Characteristics of Defendant**

The PTS Report, dated April 22, 2014, indicates that Hoover was born in California, where he lived until 2004, when he moved to Arizona, and has been residing at the Torrey Pines Drive address, Mohave Valley, Arizona since January 2011. Hoover resided at this address with his wife and father-in-law at the time of his arrest. (Sealed doc. 25 at 2) Prior to that, Hoover resided on Lindero Street, Fort Mohave, Arizona from 2004 to 2011. (*Id.*) Hoover married Co-Defendant Deborah Boice Hoover on June 30, 1973, who is released, and together they have two adult children, Co-Defendant John Brandon Hoover, who is also released, and daughter, Evin Hoover.[10] Hoover's children, ages 28 and 30, live in an apartment in Irvine, California with their mother who is unemployed and recently moved to Irvine with the Court's approval to pool their resources and live away from the alleged victims in the Mohave Valley area. (Docs. 40, 43) According to PTS, Hoover "reported he has been self-employed since 1983, in the real estate industry. . . is the manager of Hoover Companies, LLC since 1983 and thirty-one (31) other Limited Liability Companies. . . [and] noted he currently does not have an income from these businesses." (Sealed doc. 25 at 2) Hoover reported he has never been diagnosed with, or treated for, any mental illness, does not consume alcohol, and has never experimented with illicit drugs. (*Id.*) Hoover has no prior criminal record and, of course, he was not on probation or supervised release when arrested.

From the Government's prospective, Hoover has no family living in Arizona, except his estranged brother and former business partner, s*ee* Robinson Decl., ¶ 5, and there is no appropriate third-party custodian to ensure Hoover's presence at future court hearings and compliance with all conditions of release.

Special Agent Tolhurst testified that Hoover's latest and former residences in Mohave Valley, Ft. Mohave, and Newport Beach, California have been lost to foreclosure.

---

[10] Miss Evin Hoover, who has not been charged in this indictment, was the subject of several orders regarding a recorded conversation she and Hoover had, while Hoover was in the detention facility in which the Court preliminarily determined that Hoover was directing and controlling her to sell the Paris apartment that ultimately resulted in an order restricting Hoover's telephone calls during his detention. (Docs. 32, 35, 42, 46)

Considering the bankruptcy filing and foreclosures of his other real estate, Hoover likely does not own any real property titled in his name to tie him to Arizona or California and he is likely unemployable or unable to finance new construction projects if released due to the pending indictment despite the failure of the El Rio Country Club and its homeowners association ("HOA") to remove him as president at the present time.[11]

Robert Billaud, who currently lives in the El Rio Country Club development, testified at the detention hearing that Hoover, as the HOA president with total control of the HOA's money, would not provide him complete copies of all the HOA's bank statements, contracts, and cancelled checks when he requested them. As an El Rio HOA board member, Mr. Billaud knows that the homeowners pay quarterly HOA dues of $270 and $400,000 to $500,000 should have paid for El Rio's landscaping improvements, but nothing has been done. He opined that people are being paid, but no work is being done at the development. He testified that after hiring an attorney, filing a lawsuit against Hoover, and obtaining the HOA records he had previously requested as a board member, Mr. Billaud discovered that Hoover has been paying the HOA's money to Hoover's own companies, like Equity Capital Lenders ("ECL"), but there is no legitimate HOA reason for Hoover to pay ECL the HOA's money. "We want him gone," he testified.

The Government informs the Court that its investigation has discovered that "[i]n January 2009, [Hoover] set up a bank account for ECL that listed both himself and his father-in-law as signers on the account." (Doc. 10 at 8) "From that time on, many of [Hoover's] living expenses were paid directly from ECL rather than from an account in [Hoover's] name." (*Id.*) "[Hoover] also directed to ECL proceeds of property sales and repayment of loans that were originally due to [Hoover]." (*Id.*)

While the FBI has confiscated Hoover's passport upon his arrest, Special Agent

---

[11] The Government claims Hoover operates a real estate brokerage in Arizona and participates in operation of a construction company in which Hoover's son (whose residence is in California) is a principal. (Doc. 10 at 10) Pending trial, however, Hoover and his son could have their respective licenses suspended, and would certainly have them revoked if convicted. (*Id.*) *See* A.R.S. §§ 32-2153(B)(10), -32-1154(A)(8). As a result, Hoover's real estate ventures would likely dissolve. (*Id.*)

Tolhurst opined that it is "very simple [for him] to walk across the border to Mexico" without a passport.

In light of the evidence showing Hoover's alleged embezzlement of clients' and investors' money entrusted to him as discussed in this Order, the Court can not rely on Hoover's promise that he will comply with all conditions of release. *See Hir*, 517 F.3d at 1092 (for a release order to be effective, "they depend on [the defendant's] good faith compliance.) (quoting *United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (concluding that a similarly extensive set of release conditions contained "an Achilles' heel . . . virtually all of them hinge on the defendant's good faith compliance" and "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith - or lack of it. They can be too easily circumvented or manipulated."). Like the Ninth Circuit concluded in *Hir*, the question is whether Hoover would comply in good faith with the conditions of release. Also like *Hir*, this Court concludes that there is an unacceptably high risk that Hoover will not comply with his release conditions, if released from custody. *Id.* at 1093.

Despite Hoover's positive personal attributes discussed in this factor, the Court concludes that this detention factor weighs in favor of Hoover's detention. *See Koenig*, 912 F.2d at 1193 (The absence of substantial ties to his community, his foreign contacts, and his employment history all support the district court's determination [to detain the defendant].

**4.  Nature and Seriousness of the Danger to others if  Defendant were Released**

While the Government may not seek Hoover's detention on the basis of danger, the Ninth Circuit allows district courts to assess the economic danger of a defendant's release, not just the defendant's use of force or physical violence. *See United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992) (defendant convicted of mail fraud under 18 U.S.C. § 1341 posed an economic or pecuniary danger to the community). The Government paints Hoover as an intelligent but deceitful person, sophisticated in the art of hiding assets and international travel, capable of conning vulnerable widows, former clients, and elderly victims out of their money to support himself and his immediate family with a lifestyle of the rich and famous. The Government argues, with legitimate justification from the evidence discussed herein, that

Hoover is an economic danger to the community if he were released from custody as he is particularly adept at placing other people's money and property in family member's names or under his control. He presents as a person with no employment or prospects of employment and no known assets or money to support himself, except for $10,000 in a French bank account.

The Court concludes that this detention factor weighs in favor of Hoover's continued detention.

**V. Discussion**

The Court is mindful that only in rare circumstances should release be denied and any doubts regarding the propriety of release should be resolved in favor of a defendant's release on conditions. *Motamedi*, 767 F.2d at 1407. Moreover, the mere opportunity to flee is not enough to justify detention as the Act does not require ironclad guarantees against flight. *See United States v. Himler*, 797 F.2d 156, 162 (3rd Cir. 1986) ("Mere opportunity for flight is not sufficient grounds for pretrial detention.") (citation omitted); *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) ("Section 3142 does not seek ironclad guarantees, and the requirement that the conditions of release 'reasonably assure' a defendant's appearance cannot be read to require guarantees against flight.") (citations omitted).

The Court is also keenly aware that the Government's burden of proof for detaining a person presumed innocent is not trivial. The Government must, of course, point to more than the indictment to justify a defendant's detention pending trial. It must prove by a preponderance of the evidence that a defendant poses a "serious" flight risk and no combination of conditions would reasonably assure his appearance at future court proceedings as required. 18 U.S.C. §3142(f)(2)(A) ("a serious risk that such person will flee."); *Gebro*, 948 F.2d at 1121. Nevertheless, the Government has met its burden in this case. This Magistrate Judge does not have any doubts whether Hoover should be detained. *Motamedi*, 767 F.2d at 1407.

The Court finds that detention factors one, two, three, and four strongly support Hoover's detention. The Court agrees with the Government that the evidence presented during the detention hearing offers an insight into an mature man, father, and husband who

not only wants to support his immediate family and himself in a rich and lavish lifestyle, but also an insight into a well-educated and intelligent lawyer who is willing and able to engage in significant patterns and practices of criminal deception predicated upon lies and falsehoods to treat other people's money as his own, secret their money in the names of his closest family members or legal entities he controls, and thereafter has attempted to hide it all from the victims, the United States Bankruptcy Court, and United States Government. Hoover is an intelligent, talented, an industrious real estate developer with dramatically diverse personalities. One is an exemplary side with no prior criminal history - a husband and father clearly devoted to his wife and children, who blindly believe in his innocence and unhesitatingly follow his every instruction, and a criminal side, motivated by greed, selfishness, and a creative imagination willing to deceive his former friends, clients, and the HOA members in his own real estate developments for his own personal and family benefit.

The Court concludes that there are no combination of release conditions that would reasonably assure that Hoover will appear at trial as required given his foreign connections to property and money; his international travel experience; his remarkable ability and willingness to conceal money and property, and his apparent passionate desire to live a lavish lifestyle before, during, and after filing bankruptcy and the recession, without a present identifiable source of legitimate income.

Based on the foregoing,

The Court finds that the Government has sustained its burden of proof by a preponderance of the evidence that Hoover is a serious flight risk and that no condition or combination of release conditions would reasonably assure his appearance at future court proceedings if he were he released.

Based on the foregoing,

**IT IS ORDERED** that the Government's Motion Re: Detention Pending Trial and Supplemental Motion Re: Detention Pending Trial, docs. 10, 20, are **GRANTED**. Defendant

///

///

1  John Keith Hoover shall remain detained pending trial.

2           Dated this 20th  day of May, 2014.

3

4

5                                        Lawrence O. Anderson
                                         United States Magistrate Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28